IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ROGER CHARLES DAY, JR. | ) | Civil No. 3:23-cv-371-REP |
| Plaintiff, | ) | |
| v. | ) | |
| BOEING, *et al.,* | ) | |
| Defendants. | ) | |

UNITED STATES' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS RELATOR'S COMPLAINT

Pursuant to the Court's Orders entered June 20, 2024 (Dkt. 27), June 24, 2024 (Dkt. 28), and July 31, 2024 (Dkt. 39), the United States submits its Supplemental Memorandum in Support of its Motion to Dismiss Relator's Complaint.

INTRODUCTION

By this Memorandum the United States provides a more fulsome explanation of the reasons and justifications it previously offered for dismissing this *qui tam.* The United States did not undertake a detailed explanation of its reasons for dismissing this *qui tam* in its initial submission because the Supreme Court's decision in *United States ex rel. Polansky v. Executive Health Resources, Inc.,* 599 U.S. 419 (2023), does not require any detailed discussion of the reasons in the context of a dismissal governed by Fed. R. Civ. P. 41(a)(1), such as this one. The dismissal affirmed in *Polansky* was governed by Rule 41(a)(2), which is not applicable here.

PROCEDURAL BACKGROUND

1. <u>The Complaint</u>.

Relator[1] filed this action on behalf of the United States pursuant to the False Claims Act, 31 U.S.C. § 3730(b). *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000) (holding that Relators are partial assignees of the government's damages claim). As with all *qui tam* actions, this action purports to be "brought in the name of the Government," and for an alleged injury "exclusively to the Government." *United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 425 (2023).

Named as defendants in that complaint are Boeing, Lockheed Martin, Raytheon, General Dynamics, and Northrop Grumman all of which sell "proprietarily-manufactured, specific replacement parts" to the U.S. Department of Defense (DOD) via the "Defense Logistics Agency's . . . [DLA] Internet Bid Board System (DIBBS)." Complaint at ¶¶ 1-3. Relator alleges broadly, and in conclusory terms, that DLA improperly awards contracts to the Defendants using a "purported" competitive bid process when "in fact the [Defendants are the] Sole Source of these parts." *Id.*, ¶¶ 5-7. But Relator does not identify any of the contracts or the parts he attempts to put at issue or any specific claims for payment by any defendant.

Relator alleges that DLA wrongly specifies in its "requests for quotations" that only "*exact parts*" are acceptable, *id,* ¶¶ 8, 10 (emphasis added), and that the parts are produced by only the "specific Defendants." *Id.,*¶ 10. Furthermore, Relator alleges that "other contractors"

[1] Relator is incarcerated in a Federal Correction Institute serving a 105-year term of imprisonment following his conviction for defrauding the Defense Logistics Agency. *United States v. Roger Charles Day, Jr.,* No. 3:07-cr-154 (E.D. Va.).

may not be "awarded [the] contracts", and no "other[ ] prospective contractors' parts [are] allowed as acceptable substitutes*." Id*.

Relator alleges that these defendants "uniformly, and as a matter of independent corporate policy, do not sell [the parts] through *alternative distributors* or *independent distribution* . . . . " *Id.,* ¶ 4 (emphasis added). Consequently, Relator alleges, Defendants "restrict the sale" of parts and prohibit sales through distributors, thus making the Defendants "the Sole Source"[2] of their own parts. *Id.,* ¶¶ 5, 6.

Relator does not allege that Defendants have defrauded or provided false, inaccurate, or even misleading information to DLA. To the contrary, Relator affirmatively alleges that DLA contracting officers "work[ ] with the Defendants" *and "know[ ]"* that the method by which DLA acquires the parts violates the law and regulations. *Id,* ¶ 17. (Emphasis added). Relator thus is arguing the DIBBS process itself is being used unlawfully by DLA, and critically, he alleges "DLA knows this." *Id,* ¶ 18. Furthermore, Relator does not identify in his complaint or disclosure of material evidence the names or identity of any Defendant contractor employee or DLA employee who he alleges engaged in false or fraudulent conduct, nor even differentiate among any of the five defendants. Neither does Relator assert false claims or fraud with respect to any particular procurement.

In short, Relator does not assert or allege that the DLA is the victim of a fraud by the defendants. Rather, Relator is attempting to use the FCA *qui tam* provision to challenge various

[2] "Sole source acquisition means a contract for the purchase of supplies or services that is entered into or proposed to be entered into by an agency after soliciting and negotiating with only one source." 48 C.F.R. § 2.101 (FAR, Definitions).

government policies and commercial business practices that he disagrees with, including the government's longstanding procurement policies and methods and defendants' apparent decisions not to sell parts to distributors for resale. He does so by arguing that DLA's acquisition of the parts using the DIBBS system constitutes "effectively sole source procurements," *id.* ¶ 11, and that, therefore, "all contracts awarded to these defendants through DLA's DIBBS . . . *is a false claim*." *Id.* ¶ 21. (Emphasis added). Relator characterizes the Defendants' conduct as "fraud," and DLA's actions as "conspiracy to commit fraud." *See id.* ¶ 22.[3]

2. <u>The United States' Notice of Intervention and Motion to Dismiss</u>.

After evaluating the Relator's allegations, the Government intervened for the purpose of dismissing the *qui tam* action, and simultaneously moved to dismiss the complaint. *See* 31 U.S.C. § 3730(b)(4) (permitting the United States to intervene) and 31 U.S.C. § 3730(c)(2)(A) (permitting the United States to dismiss the action).

Because no Defendant had filed an answer or motion for summary judgment at the time the United States moved to dismiss, the Government argued that, as a matter of law, "the United States was entitled to dismissal of Relator's Complaint under *United States ex rel. Polansky v. Executive Health Resources, Inc.,* 599 U.S. 419 (2023), and the applicable legal standard of Federal Rule of Civil Procedure 41**<u>(a)(1)</u>**" as provided for by 31 U.S.C. § 3730(c)(2)(A). Memorandum of Law in Support of United States' Motion to Dismiss Relator's Complaint (filed

[3] Relator does not identify in his complaint or disclosure of material evidence the names or identity of any Defendant contractor employee or DLA employee who he alleges engaged in false or fraudulent conduct, nor even differentiate among any of the five defendants. Neither does Relator assert false claims or fraud with respect to any particular procurement.

November 1, 2023) ("MTD Mem."), at 1, 6 (emphasis added). *See also United States ex rel. Gaines v. Smart Holding Corp.*, 2024 WL 2019135 at *1 (S.D. Ill. May 6, 2024) ("The United States' ability to dismiss a *qui tam* suit during the seal period is governed by Federal Rule of Civil Procedure 41(a)(1) . . . [and] allows an action to be dismissed by filing a notice of dismissal when the opposing party has not filed an answer or moved for summary judgment. . . . The False Claims Act adds an additional step, only allowing an action to be dismissed without the relator's consent when the relator is given notice and an opportunity to be heard. . . . [which] opportunity to be heard is fulfilled when the relator is able to file a response to the motion, at which point the case ends."); *United States ex rel. Sargent v. McDonough*, 2024 WL 809902, at *1 (D. Me. Feb. 26, 2024) ("Where the motion to dismiss comes before the opposing party serves either an answer or a motion for summary judgment, dismissal is virtually an entitlement."); *United States ex rel. Doe v. Credit Suisse AG*, 576 F. Supp. 3d 358, 360 (E.D. Va. 2021), *appeal pending* (pre-*Polansky*, in granting a motion to dismiss a *qui tam*, holding that "speculative allegations [by the Relator] fail as a matter of law under the FCA.")

Although neither the Supreme Court's decision in *Polansky* nor Rule 41(a)(1)(A) require the Government to provide specific reasons for dismissal prior to the filing of an answer or motion for summary judgment, the United States provided several reasons in its opening brief:

(1) Relator's allegations contained in the complaint merely take issue with the acquisition method or process DLA uses to purchase proprietary parts, but the complaint does not allege any false claim or false statement by the defendants. Therefore, the allegations are not actionable under Section 3729, MTD Mem at 3;

(2) Relator has not alleged a fraud perpetrated *against the DLA* and, therefore,

the allegations are not actionable under Section 3739, *id*, at 6, 3;

(3) Following an investigation, the United States determined that the Relator's allegations are without merit, *id*. at 4;

(4) Dismissal is commensurate with the public interest, *id*. at 6, and;

(5) Relator's allegations do not warrant the continued expenditure of government resources to pursue or monitor the action. *id.*

3. Dismissal Proceedings and the Court's Memorandum Opinion entered on June 13, 2024.

Relator did not respond in timely fashion to the United States Motion to Dismiss. Consequently, the United States subsequently submitted a "Notice to Submit for Decision Without a Hearing" on November 28, 2023 (Dkt 13), in response to which the Court entered an Order dismissing the case. (Dkt 14). Relator then moved for relief from the Order of dismissal pursuant to Rule 60, Federal Rule of Civil Procedure (Dkt. 16, 17), which was denied without prejudice. (Dkt. 20). Relator subsequently renewed his motion (Dkt. 21, 22), which this Court granted by Order entered June 13, 2024. (Dkt. 24).

In its accompanying Memorandum Opinion, the Court concluded that "the United States gave no substantively supported grounds for dismissal or for claiming an unwarranted burden," but merely "relied on undocumented conclusory assertions." Mem. Op. at 13. The Court also found that: (1) the United States did not explain why this *qui tam* suit has "little chance of success on the merits," *id.,* at 12; (2) the Government made a "skimpy showing" for dismissal, *id.*; (3) the Government's explanations were "tersely asserted," *id.,* at 4; and (4) the Government

"merely alluded to [costs of future discovery] and then only in a conclusory fashion." *Id. at* 12.[4]

STANDARD FOR DISMISSAL

Section 3730(c)(2)(A) provides as follows: "The Government may dismiss the [*qui tam*] action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." Prior to the Supreme Court's decision in *Polansky*, courts were divided regarding what standard of review applied in evaluating the government's motion to dismiss a complaint over the Relator's objections. *Compare United States v. Capital Rail Constructors,* 433 F. Supp. 3d 899, 901 (E.D. Va. 2019) (citing *Swift v. United States,* 318 F.3d 250, 252-53 (D.C. Cir. 2003) (Government has "unfettered right" to dismiss a *qui tam* action) *with United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998) (Government must identify a "valid government purpose" and "a rational relation between dismissal and accomplishment of the purpose"); *United States ex rel. Henneberger v. Ticom Geomatics, Inc.* 427 F. Supp. 701, 703 (E.D. Va. 2019) (same).

*Polansky* resolved this circuit split and held that "[a] district court should assess a [section 3730(c)](2)(A) motion to dismiss using Rule 41's standards." *Polansky,* 599 U.S. at 435. The Supreme Court explained:

> Under [Rule 41], the standard varies with the case's procedural posture.

[4] The Court also ordered briefing on the issue of whether the United States should be removed as an intervening party, Order (Dkt. 26) and ordered that a hearing on the Motion to Dismiss be held. Dkt. 25. At a telephone conference on June 20, the briefing schedule was modified; the United States was permitted to file a motion seeking leave to supplement its Memorandum in Support of Motion to Dismiss; and a hearing was scheduled on the Motion to Dismiss.

> *If the defendant has not yet served an answer or summary-judgment motion, the plaintiff need only file a notice of dismissal.* But once that threshold has been crossed—as in this case [*Polansky*]—dismissal requires a "court order, on terms that the court considers proper."
>
> * * * *
>
> The application of Rule 41 in the FCA context will differ in two ways from the norm. *The **first** pertains to procedure.* The *FCA requires* notice and *an opportunity for a hearing* before a Subparagraph (2)(A) dismissal can take place. So the district court must use that procedural framework to apply Rule 41's standards. *The **second** pertains to the set of interests* the court should consider *in ruling on a post-answer motion.*

*Id.,* 599 U.S. at 435, 436-37 (quoting Fed. R. Civ. P. 41(a)(2)).

The Supreme Court ruled that the Government is not required to make *any* showing when it intervenes and seeks a dismissal before the defendant has answered or filed a summary judgment motion. In such circumstances, the Supreme Court explained "Rule 41[(a)(1)(A)] entitles the movant to a dismissal; the district court has no adjudicatory role." *Polansky*, 599 U.S. at 436, n. 4. As another district court recently explained, "[w]here the motion to dismiss comes before the opposing party serves either an answer or a motion for summary judgment, dismissal is virtually an entitlement." *United States ex rel. Sargent,* 2024 WL 809902, at *1.

This leaves the question of what issues may be addressed during the "hearing" the relator is entitled to under the FCA if the relator objects to dismissal. The Supreme Court answered this question as well in *Polansky*, stating, that the district court "might inquire into allegations that a dismissal 'violate[s] the relator's rights to due process or equal protection.'" *Polansky,* 599 U.S. at 436, n. 4. Consistent with Rule 41(a)(1), however, the Supreme Court was careful to emphasize that, in the absence of any constitutional violations, the district court must grant a motion to dismiss under section 3730(c)(2)(A) where, as here, the government files its motion to

dismiss prior to any answer or motion for summary judgment by a defendant. *See Polansky*, 599 U.S. at 435 ("If the defendant has not yet served an answer or summary judgment motion, the plaintiff need only file a notice of dismissal"). Here, Relator has asserted no Constitutional violation of any sort.

In sum, unlike a contested motion to dismiss under Rule 12 or for summary judgment, to prevail on a motion filed under section (c)(2)(A) of the FCA, the United States need not show that a relator's complaint fails to state a claim or lacks sufficient evidence to prevail at trial. Nonetheless, and even though neither *Polansky* nor Rule 41(a)(1) requires the United States to provide any reason or explanation for dismissing a case brough on behalf of the United States at this procedural stage, the government provided an explanation for its decision to dismiss in its original Memorandum in Support of Motion to Dismiss and now provides further elaboration below.

## ARGUMENT

### I. RELATOR HAS NOT ALLEGED A COGNIZABLE VIOLATION OF THE FALSE CLAIMS ACT.

#### A. Relator's Complaint Merely Takes Issue With the Acquisition Methods DLA Uses to Purchase Particular or Exact Products From Approved Sources.

The regulations prescribing DLA's procurement methods make clear that, instead of alleging a fraud *upon* an agency of the United States, Relator's allegations simply challenge the acquisition methods that the DLA knowingly and purposely has chosen to use for over two decades.

Part 13 of the Federal Acquisition Regulation, 48 C.F.R. § 13.000, *et seq.,* establishes the requirements for "simplified acquisitions." These procedures are designed to promote (among

other things) efficiency and economy in contracting, and to avoid unnecessary burdens for agencies and contractors. 48 C.F.R. § 13.002(c), (d). In a simplified acquisition, agencies are only required to obtain competition to the "maximum extent practicable." 10 U.S.C. § 3205(c); 48 C.F.R. § 13.104.

Importantly, "critical application items"[5] can be procured through "simplified acquisitions" using the DLA's Internet Bid Board System (DIBBS). *See, e.g., Matter of W K Engineering Int'l., Inc.,* B- 414932 (Comp. Gen.), 2017 CPD P 316, 2017 WL 4684382, pp. *1, *2.

DLA does not determine which items are "critical application items." Responsibility for making that determination is committed to the particular agency (e.g., Army, Air Force) requiring the part or product DLA is tasked with procuring. *See, e.g., DOD Instruction 4140.69*, ¶ 2.2(i) (Director of DLA "uses the Service approved source of supply list for procurement of critical items"); ¶ 2.3(j) (The Secretaries of the military departments "maintain the approved source of supply list for critical items"). https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/414069p.pdf?ver=2019-12-27-071346-530 (last accessed on July 15, 2023). A "critical application item" is secured from an "approved source," and sometimes there is only *one* approved source. *See, e.g., W K Engineering Int'l., Inc.,* 2017 WL 4684382 at *4 n. 6 ("the solicitation clearly provided that quotations would be accepted only from 'the approved source of supply,' in the singular, and listed AMI in Section

[5] A critical application item is an item essential to weapon system performance or operation, or the preservation of life or safety, or safety of operating personnel, as determined by the military services. *Critical Process Filtration, Inc*., B–400746, p. *5, n.7, 2009 WL 153227 (Jan. 22, 2009).

B as the only approved source of supply, . . . *thus indicating that there was only one approved source of supply, i.e., AMI*") (emphasis added). In sum, the simplified acquisition process may require the government to acquire items using competition "to the maximum extent practicable," but it does not require the government to eschew sole source procurements, and, in many instances, there may only be one source for an item.

Disappointed contractors are free to challenge administratively – through a bid protest to the Government Accountability Office (led by the Comptroller General) – the decisions of DLA (and by extension, the designating agency) on the same basis raised by Relator in the current complaint. *See id,* at *1 ("protester also contends that the solicitation unreasonably restricted competition to those quotations submitted by the approved source of supply"). In fact, a defense contractor who *is* an approved source can file a bid protest complaining that the successful bid was awarded to an entity *erroneously* determined to be "approved," *i.e.,* that the successful bidder "was not an approved source and was ineligible for award." *Matter of United Valve Company,* B- 416277.3 (Comp. Gen.), B- 416277.4, B- 416277.5, 2019 CPD P 64, 2019 WL 442278 at 2. In such a case, if "the record [does] not clearly establish" that the party awarded the contract was "the approved source identified in the solicitation," the Comptroller General will sustain the protest, with a recommendation "that DLA determine and document whether [the successful bidder] is qualified and thereby eligible for award [*i.e.,* an approved source]." *Id.* "If the firm is not eligible, the agency should terminate the . . . contract for the convenience of the government and make award to [the bid protester], if otherwise appropriate." *Id.*

DLA's procurement methods through DIBBS comply with the Federal Acquisition Regulation and have been affirmed in bid protest proceedings by the Comptroller General. *See*

*Matter of Twin Services, Inc.,* B-415418 (Comp. Gen.), 2018 CPD P 24, 2018 WL 396348 at *2-3 (upholding DLA's rejection of an offeror's quotation received in response to a solicitation through DIBBS where the quotation fails to identify the "exact product" approved source, corresponding part number, or fails to produce evidence that the manufacturer has authorization from that approved source to manufacture the item, identify it as that approved source's name and part number, and sell the item directly to the Government.) More importantly, even if DLA's procurement methods did not comply with the Federal Acquisition Regulation, DLA is fully aware of its own systems, policies and methods. There is no allegation here that either Defendants or the government's own contracting officers have provided false or fraudulent information, either affirmatively or by concealment to DLA. To the contrary, Relator himself affirmatively alleges DLA is aware of what is going on, which undermines his allegation that a fraud took place.[6]

B. Relator Has Not Alleged Any Actionable Violation of the False Claims Act by Defendants.

1. There is no Allegation of any False Claim or False Statement.

The Relator does not allege that any Defendant made or caused to be made any false statement or false claim to DLA. Relator does not allege that any Defendant concealed its identity in order to pass itself off to DLA as an approved source. Relator does not allege that any Defendant represented to DLA that it had the exact product or part identified in the solicitation

[6] Relator's fraudulent use of this very system – by submitting fraudulent bids, including requests for quotations for an "exact part" or "exact product" from an "approved source" – led to his criminal conviction. *See infra.* Having been convicted of actual fraud against the DLA, he now challenges the legality of the acquisition process he defrauded– and purports to do so on behalf of the United States.

for quotes when they did not, or that they would supply the exact part identified when they did not. Relator does not allege that any Defendant falsely labeled any packaging or part to indicate that the correct part was supplied when it was not. Relator does not allege that any Defendant supplied any part other than the "exact product" or "exact part" identified in the solicitation, or that any Defendant otherwise supplied non-conforming or inferior parts instead of the parts required. Relator does not allege that any Defendant submitted or caused to be submitted any invoice for payment to DLA after supplying non-conforming parts, or anything other than the "exact" product or parts required, or that any Defendant invoiced DLA more than the agreed contract price for the exact product or parts. Relator does not allege that any Defendant submitted any paper, document, statement, or other communication to DLA falsely representing that it had and would supply the "exact" part or product from an "approved source."

In short, there is no allegation in the complaint of any false statement or a false claim presented to DLA. Instead, the crux of Relator's complaint is that Defendants do not sell their own parts through independent distributors, making Defendants the sole source for their respective parts.

2. <u>There is No Allegation of a Fraudulent Course of Conduct</u>

Nor do Relator's allegations describe any actionable fraudulent course of conduct. *See, e.g.*, *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 787-88 (4th Cir. 1999). Rather, he alleges that DLA identifies an exact part produced by a specific manufacturer (*i.e.,* one or more "approved source(s)") and solicits price quotations for the part which results in a firm, fixed price purchase order. Critically, there is no allegation that any Defendant or any DLA contracting officer misled DLA or (in the case of DLA contracting officers) acted outside scope

of their authority. Any such inference is foreclosed, moreover, by the Relator's own allegations that all of the alleged conduct was orchestrated at the Department level and not by Defendants or rogue government employees: "*The [Department of Defense]* DOD, via DLA, *does not allow other contractors to receive awarded contracts* to deliver the Defendants' replacement parts nor are others prospective contractors' parts allowed as acceptable substitutes as specified." Complaint, ¶ 9 (emphasis added). *See also Id.,* ¶ 13 ("*With the full knowledge and assistance of the DLA,* the Defendants have sold goods and continue to receive billions of dollars annually for the awarded bids to provide replacement parts via the DIBBS system"); ¶ 18 ("Boeing only sells direct to the DLA and has no distribut[ors] *and DLA knows this*") (emphasis added).[7]

In summary, the acquisition processes challenged by the Relator are consistent with the lawful simplified acquisitions procedures established by Federal Acquisition Regulation. But even if they violated the Federal Acquisition Regulation's simplified acquisition process, Relator

[7] Relator's allegations, spanning fewer than five pages, also fails to meet the standards of Rule 9(b). Nowhere does Relator allege *who* ("the identity of the person") engaged in fraudulent conduct, *what* the fraudulent conduct consisted of, or *when* or *where* or *how* such conduct occurred, or falsity at all. *See United States ex rel. Searle v. DRS Services, Inc*., 2015 WL 6691973 at *8 (4th Cir. 2015) (In dismissing a *qui tam*, the court held that "[Relator] fails to establish that [the defendant] violated 31 U.S.C. 3729(a)(1)(A) because [Relator] has not demonstrated that [the defendant] made a false statement, either express or implied. A claim under the FCA must be predicated upon a false statement."). Relator does not identify any false statement or any false claim. The failure to satisfy Rule 9(b), standing alone, is a sufficient reason for the United States to dismiss the complaint. *See United States ex rel. Taylor v. Boyko,* 39 F.4th 177, 189 (4th Cir. 2022) (holding that a complaint alleging FCA violations must "state with particularity the circumstances constituting [the] fraud," meaning the "who, what, when, where, and how" of the alleged fraud."); *see also United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.,* 707 F.3d 451, 455–56 (4th Cir. 2013) (holding that FCA allegations "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.").

alleges DLA "knows this." Alleging that DLA contracting officers are simply implementing Department policy, fails to allege any cognizable fraudulent scheme under the False Claims Act.

C. DISMISSAL OF THE COMPLAINT IS COMMENSURATE WITH THE PUBLIC INTEREST.

As noted above, Relator has been convicted in this Court for defrauding the Government in connection with securing bids for military parts, including "critical application items," through the DIBBS system he now challenges in his complaint. Specifically, Relator was indicted for, and convicted of wire fraud consisting of: (1) bidding on solicitations requested by the DLA using the DIBBS system; (2) concealing and attempting to conceal his true identity and associations from the DLA by forming 14 separate entities; (3) making false and fraudulent bids by falsely and fraudulently representing that his entities would supply the correct parts specified by the DLA in the solicitations; (4) falsely labeling packaging for parts supplied so as to indicate that the correct parts were in the package; (5) supplying and causing to be supplied non-conforming and inferior parts to DLA; (6) submitting, and causing to be submitted, invoices for payments after shipping nonconforming parts, which falsely represented that the correct parts had been supplied pursuant to the purchase order. *See United States v. Roger Charles Day, Jr.,* No. 3:07-cr-154 (E.D. Va.), Fourth Superseding Indictment, (ECF 141), Count I, at ¶¶ 28-31, 33-34 (entities created by Relator are listed at ¶¶ 13-26); Verdict Form, (ECF 299); Judgment in a Criminal Case, (ECF 396) (sentencing the Relator to 1,260 months incarceration.[8]

---

[8] In addition to being a convicted criminal, Relator has been admonished by other courts for filing frivolous lawsuits challenging government conduct. The United States Court of Appeals for the Seventh Circuit threatened "sanctions" against the Relator "[g]iven Day's litigiousness" if he continued to pursue "frivolous actions" in an effort to "undo his conviction." *Day v. Watson,* 798 Fed. Appx. 27, 29 (7th Cir. 2020) (citing the following actions Day had filed:

Given the clear deficiencies in Relator's complaint, it is not in the public interest that it proceed. This is especially so because the discovery demands likely to be made on the United States should this *qui tam* action proceed would be unduly burdensome given the allegations implicate thousands of DLA transactions over more than two decades. Nor is this concern speculative. In his current complaint, Relator demands production of "each and every contract awarded from the DOD, specifically *but not limited to* those through DLA and DIBBS, for each and every CAGE CODE under [each Defendant's] respective control with full procurement history and actual cost to produce said good or service for the respective contract item at the time it was awarded." Complaint, p. 5 at "Demand" (emphasis added). Additionally, Relator demands "[a] list of the Defendants' distributors authorized to sell to the DOD." *Id.* Relator seeks

(1) a direct appeal to the Fourth Circuit, *see Day,* 700 F.3d at 716–17; (2) a § 2255 motion in the Eastern District of Virginia, *see United States v. Day,* No. 3:07cr154-JAG-3, 2016 WL 96161, at *1 (E.D. Va. Jan. 8, 2016); (3) a petition under § 2241 in the District of Columbia, *see Day v. Trump,* 860 F.3d 686, 688 (D.C. Cir. 2017); (4) another § 2241 petition in the Southern District of Indiana, *see Day v. Daniels,* 673 F. App'x. 582, 583 (7th Cir. 2017); (5) a suit against the Executive Office of the President, *see Day v. Exec. Office of the President,* 697 F. App'x. 17 (D.C. Cir. 2017); (6) a complaint under 18 U.S.C. § 3192 in the District of Columbia, *see Day v. Trump,* 744 F. App'x 1 (D.C. Cir. 2018); and (7) a second § 2255 motion in the Eastern District of Virginia, *see* (8) *United States v. Day,* 746 F. App'x. 212, 213 (4th Cir. 2018)—in addition to the then-current action Day had brought against the warden of the United States Penitentiary in Terra Haute, alleging that he had been "tried and punished for offenses NOT specified in the warrant of extradition," in violation of § 3192 (construed as an additional petition for a writ of habeas corpus under § 2241)). *See Watson,* 798 Fed. Appx. at 27-28. *See also* (9**)** *Day v. U.S. Department of State,* 2022 WL 3700904 (D. D.C. 2022) (FOIA suit); (10) *In re Day,* 844 Fed. Appx. 686 (4th Cir. 2021) (mandamus action against district court for delaying decision on petition for compassionate release; denied as moot); (11) *United States v. Day,* 859 Fed. Appx. 671 (4th Cir. 2021) (appeal from district court's denial of petition for compassionate release); (12) *Day v. Haskett,* 2021 WL 3510654 (D. D.C. 2021) (suit under the Torture Victim Protection Act, the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and the Racketeering Influenced and Corrupt Organizations Act against four officials of the United States Department of State, one official of the United States Department of Justice, and the former Minister of Foreign Affairs and Secretary of Public Security for the United Mexican States)).

information on contracts spanning more than two decades, dating back to 2003. *Id.* Additionally, all of this information is sought without properly differentiating among any of the Defendants or identifying any contract or product in particular, and without providing subject-matter limitation. Relator simply demands information concerning *all* contracts.

To put Relator's demand in perspective, in fiscal year 2020 alone, DLA awarded 9,000 contracts per day. *See* DLA Strategic Plan 2021–2026, at 3, at https://www.dla.mil/Portals/104/Documents/Headquarters/StrategicPlan/DLAStrategicPlan2021-2026.pdf (last accessed on July 8, 2024).[9] The potential volume of contracts at issue—for which the Relator estimates damages to exceed $100 billion—thus is enormous. With the allegation of "conspiracy" included, the volume of emails, communications, and other electronically stored documents—some of which would implicate deliberative process, and potentially other privileges—that would necessarily have to be reviewed and produced in this case would necessarily consume huge amounts of government resources. Moreover, since Relator alleges that countless DLA employees engaged in fraud merely by effectuating DLA's longstanding procurement policy and practices, the Department of Justice would almost certainly be inundated with requests for representation by scores of DLA employees, and this would further waste the Department's limited resources.

[9] *See also* "Your Guide to DIBBS, the DLA'S Internet Bid Board System," under subheading "Why using DIBBS can be challenging" ("The DLA provides over $34 billion in goods and services each year, and processes an average of 100,000 requisitions and 10,000 contract actions each day") at https://www.odysseydcs.com/your-guide-to-dibbs-the-dlas-internet-bid-board-system/#:~:text=The%20DLA%20provides%20over%20%2434%20billion%20in%20goods,100%2C000%20requisitions%20and%2010%2C000%20contract%20actions%20each%20day (last accessed July 8, 2024).

The expenditure of Government resources on a scale needed to respond to such an overwhelming amount of potential discovery is unwarranted. It is not in the public interest given that Relator has not alleged a cognizable claim under the False Claims Act. Relator is neither challenging a specific contract nor contract action that he was involved in or of which he has personal knowledge. Rather, he has made a blanket allegation of improper procurement policies and processes that is supported by not a single fact sufficient to support a claim for fraud and that is thoroughly undercut by Relator's allegation that DLA knew all along what was going on. It is nothing but a wild goose chase being set in motion by a convicted felon who has been found to have engaged in vexatious litigation by other courts.

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed.

Dated: July 31, 2024

Respectfully submitted,

JESSICA D. ABER
United States Attorney

BY: _/s/________________________________
ROBERT P. MCINTOSH
VSB No. 66113
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: (804) 819-7404
Facsimile: (804) 771-2316
Email: Robert.McIntosh@usdoj.gov
*Attorneys for the United States*

CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of July 2024, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Elliott M. Harding, Esquire
Harding Counsel, PLLC
1260 Clifden Greene
Charlottesville, Virginia 22901
Email: elliott@hardingcounsel.com

And I hereby certify that I will mail the document by United States mail, first-class postage prepaid, to the non-filing user addressed as follows:

/s/______________________________

Robert P. McIntosh
Virginia Bar Number 66113
Attorney for the United States of America
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone: (804) 819-7404
Facsimile: (804) 771-2316
Email: Robert.McIntosh@usdoj.gov