IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA
EX REL. ROGER CHARLES DAY, JR.,

        Plaintiffs,

v.                               Civil Action No. 3:23-cv-371

BOEING ET AL.,

        Defendants.

## MEMORANDUM OPINION

This matter is before the Court on the RELATOR'S MOTION TO REMOVE THE UNITED STATES OF AMERICA AS A PARTY ("the REMOVAL MOTION"), ECF No. 37, and the UNITED STATES' MOTION TO DISMISS THE COMPLAINT ("the DISMISSAL MOTION"), ECF No. 9 (collectively, "the MOTIONS") as well as the supportive, opposing, and supplemental briefs, ECF Nos. 10, 38, 40, 41, 42, 43, 47, 48, 51, 53, 54. For the reasons set forth below, the REMOVAL MOTION, ECF No. 37, was denied and the DISMISSAL MOTION, ECF No. 9, was granted.

## I. FACTUAL BACKGROUND[1]

On June 7, 2023, Roger C. Day, Jr. ("Day" or "Relator") filed a COMPLAINT against multiple companies that are defense contractors for the United States government. Those companies include The Boeing Co., Lockheed Martin Corp., Raytheon

---

[1] The Factual Background recites the facts as they are alleged in the COMPLAINT, ECF No. 1.

Technologies Corp., General Dynamics Corp., and Northrop Gruman Corp. (collectively, "the Defendants"). ECF No. 1. Day brought the suit as a Qui Tam plaintiff under the False Claims Act ("FCA"), 31 U.S.C. § 3729-3733, pursuant to § 3730(b). ECF No. 1, at 1-2, 4.

The COMPLAINT alleges that the Defendants independently sell to the U.S. Department of Defense ("DOD")—specifically, the DOD's Defense Logistics Agency ("DLA")—proprietarily manufactured replacement parts for specific goods that only they make. They submit "bids" through the DLA's Defense Internet Bid Board System ("DIBBS") and do not sell to or bid their products out to other distributors. Id. at 2. Day alleges that, because no other companies can submit competing bids for the parts, this practice by the Defendants effectively results in a "sole source" procurement process, rather than a "competitive" bidding process. Id. That allows the Defendants to charge the DLA whatever they choose. The result of using this allegedly unlawful sole source procurement process is that the DLA must accept the bid or go without the replacement parts necessary for its equipment to function. Id. at 3.

Without naming it as a Defendant, Day also effectively alleges that the United States, through the DLA, is intentionally engaging in this purported wrongdoing alongside the Defendants. It is alleged that the DLA never awards a contract to any other company because, according to DLA standards, no other company meets the

2

requirements for a contract that is out to bid. Id. Thus, the DLA, through its DIBBS system, allegedly has shutout any and all competition from other potential competitors of the respective Defendant's replacement parts. Consequently, Day alleges, these purchases are "sole sourced"—as defined by the Federal Acquisition Regulations ("FARS"), 48 C.F.R. §13.000 et seq.—but described and disguised as competitive bids by the DLA and Defendants alike. Id.

Hence, every time a Defendant submits one of these bids, it does so knowing that it violates federal statutory and regulatory requirements. Each bid is therefore said to constitute a false claim made to the government. Id. The DLA then turns around and sells these parts to DOD end users at the inflated noncompetitive prices. Id.

Through this practice, Day alleges that the Defendants have been able to reap additional, unwarranted profits—with the help of the DLA and "DLA contracting officers." Id. at 3-4. Therefore, the COMPLAINT alleges that, in addition to the named Defendants, the DLA itself, and individual (but unnamed) DLA contracting officers, acting in their official capacities, also violate the FCA by engaging in the offending practice. Id. at 4. This alleged fraud and conspiracy to commit fraud purportedly defrauds the United States and its taxpayers of billions of dollars each year. The unlawful practice has purportedly been ongoing since 2003, resulting in over $1 billion a year in unwarranted gains to each

of the Defendants.

Pursuant to 31 U.S.C. § 3733, Day asks the Court to require the Defendants to produce copies of all of the contracts awarded to them by the DOD for each "CAGE CODE," including, but not limited to, those awarded by the DLA and DIBBS, along with the full procurement history and actual production cost for the good or service at the time that the contract was awarded. He further requests that the Defendants produce a list of their authorized distributors who sell these same parts to the DOD. He does not seek all of these documents from within a particular timeframe; however, it can be assumed the timeline is from 2003—the year in which he alleges the violative practice began—to the present. He seeks a jury trial and the full qui tam benefits under 31 U.S.C. § 3730. Id. at 5.

On November 1, 2023, the United States, pursuant to 31 U.S.C. § 3730(b)(2) & (4), notified the Court of its intent to intervene as a Plaintiff for the purpose of dismissing the COMPLAINT pursuant to its powers in qui tam actions under 31 U.S.C. § 3730(c)(2)(A). ECF No. 11. It contemporaneously filed the DISMISSAL MOTION and a brief supporting the MOTION. ECF Nos. 9, 10. Originally, the Court granted the DISMISSAL MOTION. ECF No. 14.

Day later moved the Court to reconsider and vacate its decision granting the DISMISSAL MOTION, arguing, in part, that the United States failed to supply sufficient reasoning to have

warranted dismissing the case. ECF No. 16. The Court denied the initial Motion to Reconsider without prejudice. ECF No. 20. Day filed a new motion shortly thereafter seeking vacatur. ECF No. 21.

Upon consideration of Day's Second Motion to Vacate, the Court issued a MEMORANDUM OPINION and ORDER granting Day's motion and vacating its earlier decision to dismiss the case. ECF Nos. 24, 25. The Court held that the "COMPLAINT quite clearly alleges false claims by the Defendants[, and] alleges that the Government procurement agencies were knowingly complicit in the making of the false claims that were alleged." United States ex rel. Day v. Boeing, No. 3:23-cv-371, 2024 U.S. Dist. LEXIS 106044, at *12-13 (E.D. Va. June 13, 2024). Furthermore, the Court held that it had failed properly to employ the directives of the Supreme Court of the United States in United States ex rel. Polansky v. Exec. Health Res., Inc., 143 S. Ct. 1720, 216 L.Ed.2d 370 (2023), which was a "fundamental mistake of law that necessitates relief under [Fed. R. Civ. P.] 60(b)(6)." Id. at *13. Lastly, the Court held that the United States failed to provide "substantively supported grounds for dismissal or for claiming unwarranted burden" in litigating the case and ordered the United States to give such reasons upon remand. Id.

After the MEMORANDUM OPINION was issued, the United States and Day filed additional briefing to again address whether the Court should grant the Government's DISMISSAL MOTION. ECF Nos. 40,

41, 42, 48, 51, 53, 54. Day also filed the REMOVAL MOTION, ECF No. 37.

In the REMOVAL MOTION, Day argues that the Court must remove from the lawsuit both the United States as intervenor and the United States Department of Justice ("DOJ") and the United States Attorney General as counsel for the United States, lest an unwaivable conflict of interest infect the proceedings in violation of Day's constitutional right to due process. ECF No. 37. The parties subsequently filed briefs to address the REMOVAL MOTION. ECF Nos. 38, 43, 47. On October 29, 2024, the Court held a hearing to further consider the DISMISSAL MOTION, the REMOVAL MOTION, and the issues raised therein, including whether the Court would violate Day's constitutional rights if it dismissed the action without affording Day further discovery.

## II. FALSE CLAIMS BACKGROUND & STANDARD OF REVIEW

Generally, the False Claims Act imposes civil penalties on defendants who knowingly submit false claims to the United States. 31 U.S.C. § 3729(a). The statute empowers both a private plaintiff in a qui tam action, known as a relator, and the United States to sue individuals who violate the FCA. Id. § 3730(a)(b). Relators, however, do not bring a suit for themselves alone, but instead, they sue "for the United States Government . . . in the name of the Government." Id. §3730(b)(1). For this reason, the Supreme Court has held that the United States is the "real party in

6

interest" in <u>qui tam</u> FCA lawsuits. <u>Polansky</u>, 143 S. Ct. at 1728, 1734 n.4.

When a relator initiates a <u>qui tam</u> action, a copy of the complaint and evidence of the claims must be served to the United States. Fed. R. Civ. P. 4(d)(4); 31 U.S.C. § 3730(b)(2). The action then remains under seal for 60 days. During that time, one of two circumstances may occur: (1) the United States may choose to intervene as a plaintiff and take primary control over the action, <u>id.</u> § 3730(c)(1)-(2); or (2) the United States may choose not to intervene, which then allows the relator to continue prosecuting the action unless and until the United States chooses to intervene as a plaintiff after the seal period expires. <u>Id.</u> § 3730(c)(3)-(4). The defendants are not notified of the relator's suit until the 60-day seal period expires. Because of this, when the United States intervenes during the seal period, it does so before a defendant has filed an answer or summary judgment motion.

This case comes during the first procedural posture: The United States has intervened during the 60-day seal period before the Defendants have filed an answer or summary judgment motion. When the United States intervenes at this stage, "it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the [Relator]." <u>Id.</u> § 3730(c)(1). At this point in the litigation, the FCA grants the United States "uncommon, even extraordinary, power" compared to the Relator to

litigate the lawsuit. <u>Polansky</u>, 143 S. Ct. at 1730.

Most importantly for today's case, the statute empowers the United States to "dismiss the action notwithstanding the objections of the [Relator]." 31 U.S.C. § 3730(c)(2)(A). The only other requirements for dismissal imposed on the United States by the FCA at this point are that it must notify the Relator of its request to dismiss and that the district court must "provide[] the [Relator] with an opportunity for a hearing on the motion." <u>Id.</u> The Supreme Court has held that Rule 41(a) of the Federal Rules of Civil Procedure governs this dismissal procedure. <u>Polansky</u>, 143 S. Ct. at 1733.

Rule 41(a) establishes the requirements for voluntarily dismissals of civil actions by plaintiffs. Specifically, it provides that any plaintiff "may dismiss an action without a court order by filing[] a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment." Fed. R. Civ. P. 41(a)(1)(A)(i). A district court owes "substantial deference" to reasons given by the United States to dismiss if it intervenes in the <u>post</u>-answer and <u>post</u>-summary judgment stage and "should think several times over before denying a motion to dismiss." <u>Polansky</u>, 143 S. Ct. at 1734. As for the United States' requests for dismissal at the <u>pre</u>-answer and <u>pre</u>-summary judgment stage, the Fourth Circuit has held that the United States is "entitled to <u>even greater deference</u> since no court order is

8

required" for dismissal. <u>United States ex rel. Doe v. Credit Suisse</u> <u>AG</u>, 117 F.4th 155, 161 (4th Cir. 2024) (emphasis added).

Nonetheless, the United States is not permitted <u>absolute</u> discretion. A district court must still examine two primary issues before granting, pursuant to Section 3730(c)(2)(A), a motion to dismiss at the pre-answer stage. It must (1) determine whether the United States has given reasonable substantive justifications for dismissal, and (2) whether granting dismissal without an evidentiary hearing would infringe upon the Relator's constitutional due process or equal protection rights. <u>Polansky</u>, 143 S. Ct. at 1734 n.4; <u>Doe</u>, 117 F.4th at 161-62. In this way, the district court adds Section 3730(c)(2)(A)'s gloss onto Rule 41(a)'s standards for voluntarily dismissals by plaintiffs. Only after determining that the United States has reasonably justified its motion to dismiss and that dismissal without a hearing would not violate the Relator's constitutional rights may the district court grant the United States' motion to dismiss the complaint.

### III. ANALYSIS

At the October 29 hearing, both parties agreed that the record satisfied the requirement to conduct a hearing before dismissal to determine whether dismissal of the case on motion of the United States would violate Day's constitutional rights. Therefore, it is now necessary to ascertain whether Day's constitutional rights would be violated and whether the United States has provided

sufficient substantive reasons to justify granting the DISMISSAL MOTION.

The United States has put forth two additional reasons, separate from the Polansky and Doe standards for dismissal, that it asserts would independently justify granting the DISMISSAL MOTION. Those additional reasons are that: (1) sovereign immunity bars Day's suit because he effectively alleges that the United States is a Defendant in this qui tam FCA action, albeit an unnamed one, ECF No. 43, at 2-7; and (2) Day has failed to satisfy Fed. R. Civ. P. 9(b)'s higher pleading standard for fraud claims, ECF No. 40, at 14 n.7.

However, before the Court can fully address the DISMISSAL MOTION, it is necessary to address Day's REMOVAL MOTION, ECF No. 37. That is because, if the REMOVAL MOTION is granted, the United States would no longer be a party to the action, rendering its DISMISSAL MOTION moot. To that question we now turn.

### A. DAY'S MOTION TO REMOVE

In the REMOVAL MOTION, ECF No. 37, Day asks the Court to do two things: (1) remove the United States itself as an intervenor-plaintiff; and (2) remove the Attorney General and DOJ as legal counsel to the United States. ECF No. 37. He argues that removal is warranted because the United States' presence as a party (by intervention), as well as the Attorney General and DOJ's presence as legal counsel to the United States, present an unwaivable

conflict of interest that violates his substantive due process rights. ECF No. 38, at 2-7.

The FCA does not explicitly provide relators the power to remove the United States as an intervenor or the DOJ or the Attorney General as its counsel. Whether a relator has such power is a question of first impression. Indeed, neither party cites any decision from any court that directly addresses the issue.

The first question is whether Day has the power, as a _qui tam_ relator, to remove the United States as an intervenor-plaintiff from a _qui tam_ FCA lawsuit. Day cites neither statutory nor judicial authority for his view that such power exists. Instead, he takes the view that the purpose and intent of the statute alone supports such a power. Nevertheless, it is a cardinal rule of statutory interpretation that the interpretive analysis should begin with the statutory text. That analysis follows and then we will assess Day's statutory purpose and intent argument.

1. REMOVAL OF THE UNITED STATES OF AMERICA AS INTERVENOR

Day posits that the Court must remove the United States as an intervenor-plaintiff because its presence in the lawsuit presents an unwaivable conflict of interest that infringes upon his substantive due process rights. ECF No. 38, at 1-2. Before the Court can address the substantive reason for why it _should_ remove the United States as a party, however, it is necessary to determine whether it in fact _can_ do so.

### a. THE STATUTORY TEXT

The U.S. Code silos the FCA's provisions in Sections 3729-3733. 31 U.S.C. §§ 3729-3733. The portions most relevant to the resolution of the REMOVAL MOTION are Sections 3729-3731. Those sections are replete with references to the United States' authority in FCA suits. They also demonstrate the comparatively inferior role of relators in qui tam suits. Overall, the statutory text shows that the United States—not the relator—is the master of FCA qui tam lawsuits; and, these provisions provide strong evidence that a relator cannot remove the United States as a party once it has intervened as a plaintiff.

Sections 3729 and 3730(d) deal primarily with liability and relief. Section 3729 provides the following:

> Subject to paragraph (2), any person who [commits an FCA offense] . . . is liable to the United States Government for a civil penalty . . . plus 3 times the amount of damages which the Government sustains because of the act of that person. [31 U.S.C. § 3729(a)(1) (emphasis added).]

> If the court finds that [any person who commits a relevant FCA offense cooperated with authorities' investigations in particular manners] . . . the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person. [Id. § 3729(a)(2) (emphasis added).]

> A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

Id. § 3729(a)(3) (emphasis added). Then, Section 3730(d) provides the following:

If the Government proceeds with an action brought by a
person under subsection (b), such person shall, subject
to [conditions] receive at least 15 percent but not more
than 25 percent of the proceeds of the action or
settlement of the claim . . . [In other circumstances,]
the court may award such sums as it considers
appropriate, but in no case more than 10 percent of the
proceeds . . . [Id. § 3730(d)(1) (emphasis added).]

If the Government does not proceed with an action under
this section, the person bringing the action or settling
the claim shall receive an amount which the court decides
is reasonable for collecting the civil penalty and
damages. The amount shall be not less than 25 percent
and not more than 30 percent of the proceeds of the
action or settlement and shall be paid out of such
proceeds. [Id. § 3730(d)(2) (emphasis added).]

Whether or not the Government proceeds with the action,
if the court finds that the action was brought by a
person who planned and initiated the violation of
section 3729 upon which the action was brought, then the
court may, to the extent the court considers
appropriate, reduce the share of the proceeds of the
action which the person would otherwise receive under
paragraph (1) or (2) of this subsection, taking into
account the role of that person in advancing the case to
litigation and any relevant circumstances pertaining to
the violation. If the person bringing the action is
convicted of criminal conduct arising from his or her
role in the violation of section 3729, that person shall
be dismissed from the civil action and shall not receive
any share of the proceeds of the action. Such dismissal
shall not prejudice the right of the United States to
continue the action, represented by the Department of
Justice.

Id. § 3730(d)(3) (emphasis added).

Collectively, these provisions demonstrate three things: (1)
the United States, not the relator, is the primary victim of an
FCA offense; (2) violators are liable to the United States, not
the relator, for an FCA offense; and (3) the United States, not

13

the relator, receives the lion's share of the damages awarded in an FCA lawsuit (at minimum, 70%). All three statutory realities teach that the United States possesses the dominant role in FCA litigation when initiated by a qui tam plaintiff.

The Supreme Court in Polansky, although addressing a different issue, tacitly acknowledged that very fact when it explained that the United States' interest in the suit "is the predominant one." Polansky, S. Ct. at 1733 (emphasis added). The Court also made clear that, when the United States does decide to intervene:

> [N]othing about the statute's objectives suggests that the Government should have to take a back seat to its co-party relator. The suit remains, as it was in the seal period, one to vindicate the Government's interest.

Id.

Additional sections of the statute provide even greater support for that conclusion. Specifically, Sections 3730(b)-(c) and 3731 detail the procedures managing qui tam actions and the relative powers of the relator and United States in those actions. Sections 3730(b)-(c) contain the most provisions demonstrating the United States' power in FCA suits. Section 3730(b) provides the following:

> A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting. [31

14

U.S.C. § 3730(b)(1) (emphasis added).]

The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information. [Id. § 3730(b)(2) (emphasis added).]

The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal. [Id. § 3730(b)(3).]

Before the expiration of the 60-day [seal] period . . . the Government shall—

    proceed with the action, in which case the action shall be conducted by the Government; or

    notify the court that it declines to take over the action . . . [Id. § 3730(b)(4)(A)-(B) (emphasis added).]

When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action.

Id. § 3730(b)(5) (emphasis added). This Section demonstrates that, if it chooses to intervene (as here), the United States primarily conducts the litigation while the relator takes a backseat.

While a relator brings the suit, he does so in the United States' name. Id. § 3730(b)(1). That is, after all, why qui tam suits are named United States ex rel. [relator's name]. Polansky, 143 S. Ct. at 1727 n.1. Once the United States intervenes, the action cannot be consensually dismissed without the consent of the United States, 31 U.S.C. § 3730(b)(1). And, the mere presence of the United States in the case forecloses other parties from intervening in the case. Id. § 3730(b)(5). Perhaps most

importantly, when the United States chooses to intervene during the seal period (as it has here), it "shall[] proceed with the action, in which case the action shall be conducted by the Government." Id. § 3730(b)(4)(A) (emphasis added). Granting a relator the power to remove the United States as co-plaintiff would render it impossible for the United States to comply with Congress's commands that it "shall" "proceed" with and "conduct[]" the action. See Kingdomware Techs., Inc. v. United States, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); Genetics & IVF Inst. v. Kappos, 801 F. Supp. 2d 497, 504 (E.D. Va. 2011) ("Use of the word 'shall' in a statute generally denotes the imperative . . . Thus, as one would expect, in both common and statutory usage, 'shall' generally means a mandatory requirement or obligation." (citations omitted)). Instead, once the United States intervenes, removing it would leave the relator alone with the ability to "proceed" with and "conduct[]" the lawsuit, which would contradict the statutory directive. 31 U.S.C. § 3730(b)(4)(A).

Next, Section 3730(c) details the specific "Rights of the Parties to Qui Tam Actions." Those provisions provide:

> If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action, subject to the

limitations set forth in paragraph (2). [31 U.S.C. § 3730(c)(1) (emphasis added).]

The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion. [Id. § 3730(c)(2)(A) (emphasis added).]

The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances . . . [Id. § 3730(c)(2)(B).]

Upon a showing by the Government that unrestricted participation during the course of the litigation by the person initiating the action would interfere with or unduly delay the Government's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment, the court may, in its discretion, impose limitations on the person's participation, such as—

limiting the number of witnesses the person may call;
limiting the length of the testimony of such witnesses;
limiting the person's cross-examination of witnesses; or
otherwise limiting the participation of the person in the litigation. [Id. § 3730(c)(2)(C)(i)-(iv) (emphasis added).]

Upon a showing by the defendant that unrestricted participation during the course of the litigation by the person initiating the action would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense, the court may limit the participation by the person in the litigation.

Id. § 3730(c)(2)(D) (emphasis added). These subsections of 3730(c) have a core commonality: They all put the relator in an inferior control position compared to other parties to the suit.

Similar to Section 3730(b), Section 3730(c)(1) dictates that, once it chooses to intervene, the United States "shall have the primary responsibility for prosecuting the action." Id. § 3730(c)(1) (emphasis added). Again, Day runs into a "shall" problem. If the Court removed the United States from the lawsuit, it would effectively grant the Relator, Day, "primary responsibility" to prosecute the action. In fact, it would grant Day the sole responsibility to prosecute the action because, once the United States has intervened (and hypothetically been removed), no other party could intervene as a plaintiff to influence or take "primary responsibility" over prosecuting the action. Id. § 3730(b)(5). Such an interpretation would inevitably contradict another part of the same statutory provision, namely, that the United States "shall not be bound" by acts of the relator. Id. 3730(c)(1) (emphasis added). In a suit brought "in the name of" the United States, id. § 3730(b)(1), if the relator were given sole prosecutorial authority as a consequence of removing the United States as intervenor, any action then taken by the relator would subsequently bind the United States and affect its eventual recovery. Again, such a result conflicts with the commands of the statutory text.

The next subsections demonstrate the sheer scope of the power of the United States to control the litigation and to subjugate the relator to its decisions. The United States can unilaterally—

over any objections by the relator—dismiss or settle the lawsuit. Id. § 3730(b)(1)(A)-(B). As the Supreme Court has noted, these two subsections "grant the Government uncommon, even extraordinary, power." Polansky, 143 S. Ct. at 1730. With such great power wielded by the United States, and so little by the relator, it would be strange to allow the relator to simply bypass all of these statutory commands by removing the United States as a party at the outset of the litigation. The next two subsections provide even greater support for finding that such a bypass is not available.

Subsections 3730(c)(2)(C)-(D) give the United States and the defendant in a qui tam action power to limit the relator's involvement, but no similar provision exists for the relator. Specifically, Section 3730(c)(2)(C) grants the Court power to limit the relator's involvement upon a showing by the United States that the relator's continued unrestricted participation in the litigation would interfere or otherwise disrupt the case. These powers are broad and include a catchall provision that grants the Court discretion to "otherwise limit[] the participation" of the relator, id. § 3730(c)(2)(C)(iv), which could conceivably allow the Court to remove the relator as a plaintiff entirely upon a motion by the United States.[2] Similarly, the Court may, upon the

---

[2] This seems particularly true when considering Subsections 3730(b) & (c)(1)-(2)(A)-(B), which grant the United States "uncommon" and "extraordinary," Polansky, 143 S. Ct. at 1730, powers over the management of the lawsuit once it intervenes. 31 U.S.C. § 3730(b),

same showing by the <u>defendant</u>, limit the <u>relator's</u> participation in the litigation. <u>Id.</u> § 3730(c)(2)(D).

In these subsections, Congress gave the United States and FCA defendants means to limit the relator's involvement, but did not provide the relator with any like power to limit (or remove) the United States (or Defendant). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983) (quoting <u>United States v. Wong Kim Bo</u>, 472 F.2d 720, 722 (5th Cir. 1972) (internal alteration omitted)). Put simply, Congress's silence here speaks volumes. <u>United States v. Roof</u>, 10 F.4th 314, 390 (4th Cir. 2021) ("[W]e take it as a given that Congress knows how to say something when it wants to, its silence controls when it chooses to stay silent." (citation omitted)). Hence, that silence supports a statutory interpretation that the Relator lacks

---

(c)(1)-(2)(A)-(B). However, interpreting this broad provision to allow the United States to remove the relator may raise conflicts with other parts of the statute such as the damages awards provisions that grant the relator up to 30 percent of awarded damages. <u>Id.</u> § 3730(d). To so hold would run the risk of finding that Congress hid the proverbial "elephant[] in [the] mousehole[]." <u>Whitman v. Am. Trucking Ass'ns</u>, 531 U.S. 457, 468 (2001). Nonetheless, the Court need not address whether the United States can remove the Relator in the present case as that question is not before the Court.

the power to limit the United States' involvement in a <u>qui tam</u> FCA action by removing it as an intervenor-plaintiff.

Section 3730(c)'s other provisions provide further support for this position. The remaining provisions state:

> <u>If the Government elects not to proceed with the action</u>, the person who initiated the action shall have the right to conduct the action . . . When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, <u>may nevertheless permit the Government to intervene at a later date upon a showing of good cause.</u> [<u>Id.</u> § 3730(c)(3) (emphasis added).]
>
> Whether or not the Government proceeds with the action, upon a showing <u>by the Government that certain actions of discovery by the person initiating the action would interfere with the Government's investigation or prosecution</u> of a criminal or civil matter arising out of the same facts, the court may stay such discovery . . . [<u>Id.</u> § 3730(c)(4) (emphasis added).]
>
> Notwithstanding subsection (b), the <u>Government may elect to pursue its claim through any alternate remedy</u> available to the Government . . .

<u>Id.</u> § 3730(c)(5) (emphasis added). These provisions demonstrate that, even when the United States chooses not to intervene in the action, it still maintains power over how the relator conducts the litigation. If the United States is wholly unsatisfied with the relator's stance, it can intervene at a later date, <u>id.</u> § 3730(c)(3), or it can pursue alternative remedies that it deems appropriate. <u>Id.</u> § 3730(c)(5). When considered in perspective of the rest of the statute, these sections provide further evidence of the relator's inability to remove the United States once it has

intervened.

Lastly, Section 3731 provides:

> If the Government elects to intervene and proceed with an action brought under 3730(b), the Government may file its own complaint or amend the complaint of [the relator] to clarify or add detail to the claims in which the Government is intervening and to add any additional claims with respect to which the Government contends it is entitled to relief . . .

31 U.S.C. § 3731(c) (emphasis added). In other words, when the United States does decide to intervene, it even has the power to alter the relator's pleadings that began the action. And, notably, the relator lacks any comparable power over the United States. Therefore, Section 3731(c) too teaches that Congress did not intend to provide the relator with substantial power, such as removal power, over the United States in *qui tam* actions.

Upon an examination of the whole Act, the cited statutory provisions depict a statutory structure that empowers the United States over the relator in *qui tam* actions to a significant degree. That structure allows the United States to intervene and exert control over the case if it desires and, in many situations, dictate exactly how to direct the case. There are no provisions that give the relator power to control how the United States acts once it intervenes in the case. However, the FCA does authorize the Court, upon motion made by the United States (or a defendant), to limit and control the relator's actions.

Courts have similarly interpreted the statute as granting the

United States "uncommon, even extraordinary, power" over cases originally brought by relators. E.g., Polansky, 143 S. Ct. at 1730. Day points to no statutory provision that grants the qui tam plaintiff the power to remove the United States as an intervenor-plaintiff. Day cites no decisions from any court interpreting any FCA provision to confer such authority on relators. The answer for why is simple: None exist.

### b. HISTORY & INTENT

To support the position that the Court is authorized to remove the United States, Day points to the history, purpose, and congressional intent undergirding the FCA. ECF No. 38, at 1-3. In that history, Day finds evidence of the United States being defrauded to exorbitant degrees without sufficient judicial recourse. Id. at 2-3. In his reading of the histories, the FCA, and its subsequent amendments, provide private parties themselves with the power to vindicate the United States' interests without the involvement of the United States. Id. at 3. From that jumping-off point, Day argues that he can continue with this action without the United States and still vindicate its interests within the scope of the statute.

An extensive search has produced no authority to support the position that Day, as a qui tam relator, has the power to remove the United States as an intervenor-plaintiff. The issue therefore presents a question of first impression. Although, as Day contends,

the statutory history, purpose, and congressional intent do demonstrate a congressional will to grant private parties some power to vindicate the United States' interests, there is no indication that the FCA grants relators unfettered power to bring qui tam cases alone when the United States thinks otherwise.

Qui tam actions[3] have a rich history in English and early American law. In England, qui tam's origins date back to at least medieval times. Randy Beck, The False Claims Act and the English Eradication of Qui Tam Legislation, 78 N.C. L. Rev. 539, 567 (2000). From the beginning, these actions combined the interests of the relator, then commonly known as an "informer," and the royal government, in the name of the King. Note, The History and Development of Qui Tam, 1972 Wash. U. L.Q. 81, 83. Qui tam actions proliferated in England through at least the sixteenth century due, in large part, to their success in opening the English courts to private individuals to hold wrongdoers to account. Id. at 85-87. Beck, supra, at 567-73; Charles Doyle, Cong. Rsch. Serv. R40785, Qui Tam: False Claims Act and Related Federal Statutes 2 (2021).

---

[3] The term "qui tam action" is derived from the longer Latin phrase qui tam pro domino rege quam pro se ipso in hac parte sequitur, which translates to "who as well for the king as for himself sues in this matter." Such actions typically allow a private party to sue on his own behalf as well as on behalf of the government. Qui Tam Action, Black's Law Dictionary (12th ed. 2024).

However, reforms and near eradication of English qui tam actions ensued because of the increasing perception of informers as mere "bounty hunters," or what Sir Edward Coke called "viperous vermin," who brought actions seeking solely personal gain or to threaten their enemies. Doyle, supra, at 1-3 (citing Beck, supra, at 577-78 n.201 (quoting Edward Coke, The Third Part of the Institutes of the Laws of England 194 (1644))); History of Qui Tam, supra, at 89-90. These perceptions prompted restrictions on qui tam actions, including imposing costs and penalties on informers, stricter venue requirements, and a short statute of limitations. Those restrictions are said to have sufficiently addressed these abuses in the eyes of the public and led to a resurgence and acceptance of the practice in seventeenth-century England. History of Qui Tam, supra, at 89-91.

That, then, was the backdrop against which the American tradition of qui tam actions developed. American colonial legislatures passed, and colonial courts enforced, legislation establishing qui tam actions. Doyle, supra, at 3-4 nn.19-20 (collecting statutes and cases). The First Congress followed suit with multiple laws creating qui tam enforcement mechanisms. Id. at 4 n.22. However, the American experience with qui tam followed the same trajectory as had obtained in England with widespread adoption of qui tam followed by abuse by informers and then subsequent retrenchment, near elimination, and reform in the nineteenth

century. History of Qui Tam, supra, at 97-100.

One outlier in this trend, however, is the False Claims Act, which was originally enacted in 1863. The 1863 FCA's qui tam provisions allowed private individuals to sue on behalf of themselves and the United States for fraud perpetrated against the United States and entitled them to fifty percent of any forfeitures and damages recovered in the process. Act of March 2, 1863, Pub. L. No. 37-67, §§ 4-6, 12 Stat. 696, 698 (codified as amended at 31 U.S.C. §§ 3729-3733). The 1863 FCA was passed originally to address abuses and frauds perpetrated against the United States government during the Civil War. John T. Boese & Douglas W. Baruch, Civil False Claims and Qui Tam Actions § 1.01 (5th ed. 2024). The qui tam provisions themselves were meant to fill a void left by the federal government's lack of resources to enforce existing law and prosecute wrongdoers. At the time, the DOJ did not yet exist, and the Attorney General lacked administrative control over United States attorneys and could himself not bring all necessary actions. Id.

The qui tam provisions of the FCA received relatively little debate before passage. The bill's Senate sponsor, Sen. Jacob Howard (R-MI), gave the only explanation of their purpose as follows:

> The effect of [the qui tam provisions] is simply to hold out to a confederate a strong temptation to betray his coconspirator, and bring him to justice. The bill offers, in short, a reward to the informer who comes into court and betrays his coconspirator, if he be such;

> but it is not confined to that class. Even the district
> attorney, who is required to be vigilant in the
> prosecution of such cases, may be also the informer, and
> entitle himself to one half the forfeiture under the qui
> tam clause, and to one half of the double damages which
> may be recovered against the person committing the act.
> In short, sir, I have based the fourth, fifth, sixth,
> and seventh sections upon the old-fashioned idea of
> holding out a temptation, and "setting a rogue to catch
> a rogue," which is the safest and most expeditious way
> I have ever discovered of bringing rogues to justice.

Cong. Globe, 37th Cong., 3rd Sess. 955-56 (1863). Early decisions

interpreting the scope of a qui tam relator's power under the 1863

FCA affirmed the purpose of having relators vigorously prosecuting

fraud perpetrated against the United States and even declined to

give the United States the power to obstruct the relator's recovery

in a case originally brought by the United States itself. See,

e.g., United States v. Griswold, 24 F. 361, 364-66 (D. Or. 1885).[4]

On this point, then, Day is correct. The FCA was enacted originally

as a powerful remedial statute that bestowed relators with

significant prosecutorial power and allowed them to achieve

justice on behalf of the United States when the government was

otherwise unable, or chose not, to do so. However, Day simply takes

that point to the extreme as justification for his position. And,

in so doing, he ignores the significant amendments to the qui tam

---

[4] The 1863 FCA did not provide the United States with a means of
intervention. So, once initiated by the relator, no entity could
intervene in the relator's action. S. Rep. No. 99-345, at 10
(1986).

provisions of the 1863 FCA that were enacted in 1943.

In 1942, United States Attorney General Francis Biddle wrote to Congress asking it to completely repeal the FCA's <u>qui tam</u> provisions. S. Rep. No. 77-1708, at 1-2 (1942); H.R. Rep. No. 78-263, at 1-2 (1943). In his Letter, Attorney General Biddle argued that the purposes of the <u>qui tam</u> provisions enunciated by Sen. Howard in 1863 were "no longer pertinent." S. Rep. No. 77-1708, at 2; H.R. Rep. No. 78-263, at 2. Instead, he explained:

> Recent experience shows that plaintiffs in informers' suits not only <u>fail to furnish to the United States the information which is the basis of their actions</u>, but on the contrary, <u>at times base the litigation on information which has been secured by the Government</u> in the regular course of law enforcement. Such plaintiffs at times not only use information contained in indictments returned against the defendant, but also <u>seek to use Government files to prove their cases</u>. Consequently, informers' suits have become <u>mere parasitical actions</u>, occasionally <u>brought only after law-enforcement officers have investigated and prosecuted persons guilty of a violation of law and solely because of the hope of a large reward</u>.

S. Rep. No. 77-1708, at 2 (emphasis added); H.R. Rep. No. 78-263, at 2 (emphasis added). Attorney General Biddle found further support for his position in the then-recent decision by the Third Circuit, <u>United States ex rel. Marcus v. Hess</u>, 127 F.2d 233, 235 (3d Cir. 1942), <u>rev'd</u> 317 U.S. 537 (1943), which cited history to purportedly support the claim that <u>qui tam</u> actions "have always been regarded with disfavor."[5]

---

[5] The histories here examined disprove this statement as there

Based on the Biddle Letter, and with little debate, the Senate passed the repeal proposal near the end of the 77th Congress. The House of Representatives quickly followed suit when it reconvened in the 78th Congress. Doyle, supra, at 7.

The sentiment against relators during the brief discussions for these bills was palpable, with some congressmen describing relators as "harassing people" and the qui tam practice as having become "nothing but a racket." 89 Cong. Rec. 2800-01 (1943) (statement of Rep. Francis Walter).[6] However, before the Senate of the 78th Congress passed the repeal again, opposition by some senators led to a recission of the decision to repeal the qui tam provisions, and instead to a decision to amend those provisions in a way that significantly weakened them. Doyle, supra, at 7-8; 89 Cong. Rec. 7437-39 (1943) (statement of Sen. William Langer). A Conference Committee was convened to ameliorate the disputes

---

exists ample evidence of widespread support—though, support that, admittedly, has waxed and waned with the times—for qui tam actions dating back hundreds of years to old England and continuing throughout the history of the United States. Supra. The Supreme Court agreed as much in reversing the Third Circuit. United States ex rel. Marcus v. Hess, 317 U.S. 537, 541 (1943) ("Qui tam suits have been frequently permitted by legislative action, and have not been without defense by the courts." (footnotes omitted)).

[6] For many, this sentiment did not recede notwithstanding the later proposed and adopted revisions to the Act's qui tam provisions. See, e.g., 89 Cong. Rec. 7571 (1943) (statement by Senator Frederick Van Nuys) ("[T]oday [the 1863 FCA] has become one of the worst sources of racketeering since the days of Al Capone in the prohibition era.").

between the two Houses, which ultimately decided on incorporating much of the Senate's proposed amendments to weaken, but not fully eliminate, the 1863 FCA's qui tam provisions. H.R. Rep. No. 78-938, at 1-7 (1943) (Conf. Rep.).

The 1943 amendments revised an FCA that once strongly empowered relators to bring suits without any governmental oversight to a version that, comparatively, substantially limited relators' power to bring qui tam actions without the likelihood of governmental intervention. In particular, the 1943 amendments kept intact the original qui tam provision that empowered private parties to bring suit on behalf of the United States.[7] However, at the same time, Congress substantially changed the FCA to give the United States greater power to control qui tam actions by enacting the following:

> Whenever [a relator institutes an action] notice of the pendency of such suit shall be given to the United States by serving upon the United States attorney for the district in which such suit shall have been brought a copy of the bill of complaint and by sending, by registered mail, to the Attorney General of the United States at Washington, District of Columbia, a copy of such bill together with a disclosure in writing of substantially all evidence and information in his possession material to the effective prosecution of such suit. The United States shall have sixty days, after service as above provided, within which to enter appearance in such suit. If the United States shall fail,

---

[7] Compare § 4, 12 Stat. at 698, with An Act to Limit Private Suits for Penalties and Damages Arising Out of Frauds Against the United States, Pub. L. No. 78-213, § 3491(B), 57 Stat. 608, 608 (1943) (codified as amended at 31 U.S.C. §§ 3729-3733).

> <u>or decline in writing to the court, during said period</u>
> <u>of sixty days to enter any such suit, such person may</u>
> <u>carry on such suit. If the United States within said</u>
> <u>period shall enter appearance in such suit the same shall</u>
> <u>be carried on solely by the United States. In carrying</u>
> <u>on such suit the United States shall not be bound by any</u>
> <u>action taken by the person who brought it, and may</u>
> <u>proceed in all respects as if it were instituting the</u>
> <u>suit</u> . . .

§ 3491(C), 57 Stat. at 608 (emphasis added).[8] Thus, instead of simply stating that "it shall be the duty of the several district attorneys of the United States . . . to be diligent in inquiring into any violation of the provisions of this act by persons liable to such suit," § 5, 12 Stat. at 698, the revised FCA demanded that relators notify the United States of their suits, provide copies of the complaint to the United States, and, most importantly, give the United States an opportunity to intervene. § 3491(C), 57 Stat. at 609.

Relators of course, retained considerable power if the United States chose not to intervene within the 60-day intervention period. However, when the United States did choose to intervene, it took full control over prosecuting the action—as if the relator did not exist. Id. In either intervention scenario, Congress also significantly reduced the relators' right to recovery from a mandatory fifty percent of fines and damages, to anywhere from

---

[8] Congress also eliminated the ability of relators to bring suits based on no more information than that already known to the United States. § 3491(C), 57 Stat. at 609.

31

zero to twenty-five percent depending on the extent of the relator's knowledge of the wrongs and assistance in the process. Compare § 6, 12 Stat. at 698, with § 3491(E)(1)-(2), 57 Stat. at 609. In making these changes, Congress recognized that circumstances had changed since the enactment of the 1863 FCA, with far greater resources and capabilities at the United States' disposal to vindicate its interests without the need for substantial action by the private citizenry. S. Rep. No. 78-291, at 2-3. In sum, the 1943 amendments represent a congressional intent to reel in relators' power to initiate and conduct FCA qui tam actions and, instead, to provide the United States with greater control over such actions. Id.; 89 Cong. Rec. 7571-75 (1943) (statements by Sen. Frederick Van Nuys).

Day just skips over the history of the 1943 amendments. In his telling, the FCA in its original form was a sweeping remedial measure made to ensure that the citizenry could essentially step into the shoes of the United States and vindicate its interests whether the United States decided to act or not.

Early caselaw purportedly supported this view. ECF No. 47, at 2-3. Then, in Day's telling, history stops.

That is, until 1986 when, according to Day, Congress further "strengthened the FCA . . . by revamping its qui tam provisions to encourage private individuals to bring suits on behalf of the government" and protect the United States' coffers. ECF No. 38, at

3. He cites late-twentieth-century caselaw to support that proposition. Id. (citing United States ex rel. Doe v. John Doe Corp., 960 F.2d 318, 319 (2d Cir. 1992); United States ex rel. McCoy v. Cal. Med. Rev., Inc., 715 F. Supp. 967, 968 (N.D. Cal. 1989) ("Congress' objectives in amending the Act [were] principally to expand the role of qui tam plaintiffs and to keep pressure on the United States to prosecute the cases." (citation omitted)); id. at 970 ("Congress clearly intended to bestow upon relators in proceedings under the Act substantial power to force the prosecution of cases.")).

Day, however, makes no mention of the fact that Congress's "strengthen[ing]" of the Act in 1986 was to strengthen the 1943 version—where, while Congress did step back from the brink of entirely eliminating the 1863 FCA's qui tam provisions, it still substantially limited them to give the United States, specifically the DOJ through the Attorney General, significant power to intervene, control, and dismiss the case in its entirety.

The 1986 FCA amendments were significant and deserve mention as part of this story. But, they do not support Day's view that the Court would be effectuating Congress's intent by removing the United States itself after it has already intervened and determined that the case need not proceed.

The 1986 amendments mark the last significant revisions that

Congress has made to the FCA's qui tam provisions.[9] Those amendments included, inter alia, restructuring the early-filing period of qui tam actions to provide for a 60-day seal timeframe during which the United States can choose to intervene; allowing the relator to remain a party to the action and retain all the rights owed to parties in the action even when the United States decides to intervene; requiring the United States to provide good cause before dismissing or settling qui tam actions over the relator's objections; and increasing the potential recovery for relators in at least some qui tam cases. False Claims Amendments Act of 1986, Pub. L. No. 99-562, § 3730(b)-(d), 100 Stat. 3153, 3154-3157 (codified as amended at 31 U.S.C. §§ 3729-3733).[10]

Day is correct that these amendments "strengthened" the FCA's qui tam provisions to "encourage private individuals to bring suit on behalf of the government." ECF No. 38, at 3. Indeed, the House and Senate Judiciary Committee Reports state this explicitly. S. Rep. No. 99-345, at 2 (1986) ("The proposed legislation seeks not

---

[9] Congress again amended the FCA in 2009 as part of the Fraud Enforcement and Recovery Act of 2009 and in 2010 as part of the Patient Protection and Affordable Care Act as well as the Dodd-Frank Wall Street Reform and Consumer Protection Act. See generally Doyle, supra, at 9-10; Boese & Baruch, supra, § 1.08. However, none of these amendments altered the qui tam provisions in a meaningful way for the purposes of this MEMORANDUM OPINION. Therefore, the Court does not discuss them.

[10] For a more in-depth textual analysis of the statute and how it impacts Day's arguments, see infra.

only to provide the Government's law enforcers with more effective tools, but to encourage any individual knowing of Government fraud to bring that information forward."); H.R. Rep. No. 99-660, at 17 (1986) ("The bill amends the qui tam, or citizen suit, provisions of the existing statute to: expand the role of the qui tam plaintiff [and] increase the awards payable to the qui tam plaintiff."). However, the reforms that did make it into the final version of the bill—those described as encouraging qui tam actions— are themselves less empowering than those that were accepted for enactment.

The DOJ, in a Letter from United States Assistant Attorney General for the Office of Legislative Affairs John R. Bolton, "strongly oppose[d]" the original revisions that granted even greater power to qui tam relators because of the "history of misuse of the existing [1943] statute to bring frivolous, politically-motivated lawsuits." H.R. Rep. No. 99-660, at 63-64. The DOJ was particularly concerned about the proposed amendment that would allow qui tam plaintiffs to "continue to participate in the litigation even after the Justice Department has stepped in and is proceeding with the suit." Id. at 64. Notwithstanding the DOJ's objections, a version of this amendment still made it into the bill. § 3730(c), 100 Stat. at 3155. However, in response to this and other objections by the DOJ to the qui tam provisions, Congress amended the originally proposed, stronger qui tam provisions in

ways that weakened the powers that relators would have otherwise gained. S. Rep. No. 99-345, at 14-16.

Therefore, while the "overall intent in amending the <u>qui tam</u> section" in 1986 was to "encourage more private enforcement suits," <u>id.</u> at 23-24; <u>accord</u> H.R. Rep. No. 99-660, at 23-24, Congress ultimately enacted statutory text that struck a balance between respecting the relator's role in <u>qui tam</u> litigation and the recognition of the United States' empowered position when it chose to intervene in that litigation. The Committee observations are instructive respecting the relative roles of the relator and the United States. For example, the Senate Committee stated the following:

> In the face of sophisticated and widespread fraud, the Committee believes only a <u>coordinated effort of both the Government and the citizenry</u> will decrease this wave of defrauding public funds . . . . Keeping the <u>qui tam</u> complaint under seal for the initial 60-day time period <u>is intended to allow the Government an adequate opportunity to fully evaluate the private enforcement suit and determine both if</u> that suit involves matters the Government is already investigating <u>and whether it is in the Government's interest to intervene and take over the civil action</u> . . . . Under this provision, <u>the purposes of qui tam actions are balanced with law enforcement needs</u> as the bill allows the <u>qui tam</u> relator to both start the judicial wheels in motion and protect his own litigative rights . . . . Additionally, much of the purpose of <u>qui tam</u> actions would be defeated unless the private individual is able to advance the case to litigation. The Committee feels that sealing the initial private civil false claims complaint <u>protects both the Government and the defendant's interests without harming those of the private relator</u> . . . . [Sixty] days is an adequate amount of time to allow <u>Government coordination, review and decision</u>.

S. Rep. No. 99-345, at 2, 24-25 (emphasis added). The House Report supports the same:

> In order to solve the problems with the current law . . . the Committee bill expands the role of the relator so that when the Government enters an action filed by a relator, the relator remains a party to the suit with the same rights as if he had been an intervenor of right . . . . The <u>Government remains the primary litigant and has control of the litigation</u> . . . . Because of concerns that discovery conducted by the relator may interfere with discovery being conducted by the Government, the provisions allow [sic] the Court to stay discovery being conducted by the relator . . . <u>This provision also allows the Government to settle the action notwithstanding the objections of the relator</u>.

H.R. Rep. No. 99-660, at 24 (emphasis added). Ultimately, in a separate letter by Acting United States Assistant Attorney General Phillip D. Brady, the DOJ reflected its approval of the balance that Congress struck between the relator's role and the DOJ's powers in these actions. S. Rep. No. 99-345, at 36.

Looking at the FCA's history as a whole tells a complex story—one in which Congress's views of qui tam actions as a means to achieve its central goal of combatting fraud perpetrated against the United States vacillate between full-throated support to consternation and outright condemnation. That story begins in the 1860s with a qui tam process that gave virtually unfettered power to relators to bring qui tam actions on behalf of the United States without governmental interference. In the 1940s, the pendulum swung hard in the opposite direction. While Congress saved qui tam

actions as a means to vindicate the United States' interests, Congress simultaneously recognized significant abuses inherent within a system that combines the public interests of the United States with the personal financial interests of the relator bringing suit on the United States' behalf. Congress partially recorrected in the 1980s to give some power back to relators, but that power has fallen far from its apex witnessed in the nineteenth and early twentieth century.

No matter how much Day wishes it were otherwise, the FCA statutory scheme operative today provides him as a qui tam relator with far less power than that possessed by relators 160 years ago. Instead, although Day does retain some statutory rights in the litigation, the current statutory scheme provides the United States with broad authority to step into, and take control over, Day's lawsuit. This balance of power was the clear intent of Congress and properly effectuates the purposes behind the statute.

To allow Day to remove the United States because of disagreements in litigating strategy, a purported conflict of interest, or for any other reason, would not only undermine but would fly directly in the face of what Congress has done since 1863. Day's view, if adopted, would allow a relator to make decisions about litigation that squarely impact the interests of the United States without giving the United States power to influence that litigation as Congress intended by weakening

relators' powers at the expense of expanding the United States' powers.

The Court declines to follow Day into these untested waters. For the foregoing reasons, Day, as a qui tam relator, does not possess statutory authority to remove the United States as an intervenor-plaintiff from a FCA qui tam action.[11] Because the Court holds that Day cannot remove the United States as an intervenor-plaintiff from this qui tam action, it need not address the substantive reasons that Day alleges justify why the Court should remove the United States as a party to the action.

## 2. REMOVAL OF THE ATTORNEY GENERAL AND DOJ AS LEGAL COUNSEL OF THE UNITED STATES OF AMERICA

The REMOVAL MOTION only asks the Court to remove the United States "as a party" to the suit because of a conflict of interest. ECF No. 37, at 1. However, in his MEMORANDUM OF LAW IN SUPPORT OF RELATOR'S MOTION TO REMOVE THE UNITED STATES OF AMERICA, Day also asks the Court, in the alternative, to remove the Attorney General and DOJ as legal counsel to the United States if the Court declines to remove the United States as a party. ECF No. 38, at 6-7. In a

---

[11] The Court has some concern that the rule ought to be otherwise where, as here, it is alleged that the United States and contracting party defendants have conspired and colluded in the making of false claims. But here the allegations of conspiracy and collusion are too conclusory and general to present the need to decide the issue whether there is a conflict and, if so, what affect it may have.

reply brief, Day specifies further that the Court should remove the Attorney General and DOJ (collectively "the DOJ") and require the United States to identify "independent counsel" for representation in the action. ECF No. 47, at 5.

Day bases the request for removal of the DOJ as the United States' legal counsel on an asserted conflict of interest in violation of Rule 83.1(I) of the Local Rules of the Eastern District of Virginia and Rule 1.7(a) of the Virginia Rules of Professional Conduct. ECF No. 38, at 6-7. That conflict, he argues, must be remedied lest the Court infringe upon his constitutional substantive due process rights. ECF No. 47, at 50.

The professional legal ethics rules on which Day relies to oust the DOJ from this lawsuit, however, do not support the DOJ's removal. Those rules apply to all lawyers practicing in this Court, and they might support the removal of a single, or perhaps even multiple, United States Attorneys from a particular case in limited circumstances. However, the Court does not find support for Day's argument that a general, unspecified conflict of interest based on the DOJ's representation of a federal agency in a challenge to one of its policies or practices can serve as the basis for removal from the case of the DOJ, at least on the facts alleged here. Furthermore, the Court finds that, even if those rules could support such a sweeping holding, no conflict of interest exists in

this case that would warrant such a removal.[12]

### a. PROFESSIONAL ETHICS RULES AND CONFLICTS OF INTEREST

Day argues that the representation of the United States by the DOJ presents an extant conflict of interest that violates Local Rule 83.1(I) and Virginia Rule of Professional Conduct 1.7(a). ECF No. 38, at 6. Specifically, he argues that the "DOJ cannot be expected to fairly and ethically investigate the inner-workings of the DLA and the communications between its officers when the DOJ also has a responsibility to defend the DLA in actions involving bid procurement and procedures." Id. at 7. According to Day, the DOJ's representation of the U.S. Treasury alongside the DLA, which is allegedly "complicit or acting in concert with the Defendants," presents an insurmountable conflict of interest that "extends throughout the entire Department of Justice and the Office of the Attorney General of the United States," which requires removal. Id. at 6-7.

The rules of professional conduct that Day cites do not support that position. We begin with Rule 83.1(I) of the Local

---

[12] Day's argument that the United States' presence in the lawsuit—regardless of who represents it as legal counsel—creates an unwaivable conflict of interest that justifies its removal, ECF No. 38, at 4, is moot because the United States cannot be removed from the case. Supra. Moreover, the fact that a client might have (or has) violated a law is no reason to disqualify that client's counsel from representing the client in the lawsuit. Consequently, the Court henceforth addresses only whether the DOJ's presence presents an unwaivable conflict of interest that warrants removal.

Rules of the Eastern District of Virginia. Rule 83.1(I) provides

the following:

> **Practicing Before Admission or While Disbarred or Suspended:** Any person who, before admission to the bar of this Court or during any disbarment or suspension, exercises any of the privileges of a member of the bar of this Court, or who pretends to be entitled so to do, shall be guilty of contempt of court and subject to appropriate punishment therefor.

Local R. U.S. Dist. Ct. E. Dist. of Va. 83.1(I) (emphasis in

original). Day provides no explanation of how Rule 83.1(I) applies

to this case. The Rule's plain text requires the accuser to name

an attorney who purportedly practiced before the Court before they

were admitted to do so or while disbarred or suspended. Id. To the

Court's knowledge, counsel representing the United States in this

matter, Assistant United States Attorney Robert P. McIntosh ("AUSA

McIntosh"), is properly practicing in this District. Day makes no

specific allegation otherwise. Furthermore, even if counsel for

the United States violated Rule 83.1(I) (which did not occur),

that fact would not support the removal of the DOJ from

representing the United States in this matter. Indeed, Rule 83.1(I)

does not address conflicts of interest that could be imputed to

the DOJ to justify its removal. Simply put, Rule 83.1(I) provides

no basis for granting the relief that Day requests, and, on a more

fundamental level, bears no relation to the representation of the

United States in this case. Therefore, the Court rejects Day's

argument that a violation of Rule 83.1(I) provides for the

requested relief.

The analysis next turns to Virginia Rule of Professional Conduct 1.7(a), which provides that: "Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." Va. R. Prof'l Conduct 1.7(a). The Rule states that a concurrent conflict of interest exists if: "(1) the representation of one client will be directly adverse to another client; or (2) there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Id. Day's argument on Rule 1.7(a) is slightly more developed than that which relies on Rule 83.1(I). Nonetheless, that argument fails as well.

Day does not name a specific lawyer who would purportedly possess a conflict of interest for representing what Day describes as "multiple clients." ECF No. 38, at 7. Only AUSA McIntosh is recorded as counsel for the United States in this matter; however, Day does not allege any purported conflict of interest on behalf of Mr. McIntosh (or any other attorney for the United States) specifically. Instead, Day begins and ends his argument by alleging that the DOJ as a whole[13] has a conflict that warrants removal.

---

[13] The Court also notes that, at the time that Day filed the REMOVAL MOTION, the United States Attorney General was Merrick B. Garland.

That infirmity alone necessitates rejection of the argument based on the plain text of Rule 1.7(a). Moreover, even had Day alleged that AUSA McIntosh himself had a conflict of interest in violation of Rule 1.7(a), that fact alone would not support the disqualification of the entire DOJ.

Imputation of one lawyer's conflict of interest to that lawyer's entire law firm, and then removal of the firm as a whole, is common in the private sector. See Sunbeam Prods., Inc. v. Hamilton Beach Brands, Inc., 727 F. Supp. 2d 469, 473-74 (E.D. Va. 2010). However, it is exceedingly rare to impute a single government attorney's conflict of interest to the entire legal arm of the United States. This fact derives from the fundamental differences between private and public representation. In the private sector, clients can assumedly always hire a different law firm to represent them. However, when dealing with governmental agencies, the "only choices for federal prosecution are the local Assistant U.S. Attorneys, Department of Justice attorneys, or special prosecutors." In re Grand Jury Investigation of Targets, 918 F. Supp. 1374, 1378 n.11 (S.D. Cal. 1996); United States v.

---

At the time of publication of this MEMORANDUM OPINION, the United States has a new Attorney General in Pamela J. Bondi. Day never alleged that Attorney General Garland specifically had a conflict warranting his removal, however; instead, Day maintains his allegation generally against the Office of the Attorney General. That argument, as described above, suffers from its own substantial flaws.

_Caggiano_, 660 F.2d 184, 190-91 (6th Cir. 1981).[14] For example,
courts that have had to address whether disqualification of an
entire United States Attorney's Office due to one government
attorney's conflict of interest have rejected the possibility
outright. _Caggiano_, 660 F.2d at 191; _United States v. Bolden_, 353
F.3d 870, 875 (10th Cir. 2003) (holding that "[d]isqualifying the
entire [United States Attorney's] [O]ffice from representing the
government raises important separation of powers issues" and
refusing to do so based on those concerns); _United States v.
Sharma_, 394 Fed. App'x 591, 595 (11th Cir. 2010) (per curiam);
_United States v. Vlahos_, 33 F.3d 758, 762-63 (7th Cir. 1994)
(citing _United States v. NYNEX Corp._, 781 F. Supp. 19, 29-30
(D.D.C. 1991) ("It is one thing to restrict the prosecutorial
ability of regulatory agencies which do not normally bring criminal
contempt prosecutions, and another to restrict the Justice
Department's authority.")); _United States v. Rodella_, 59 F. Supp.
3d 1331, 1348 n.3 (D.N.M. 2014) ("[D]isqualification of an entire
United States Attorney's Office _is_ unprecedented. While a few
district courts have disqualified an entire United States

---

14 While this is not a federal prosecution per se, the FCA's
authorization of intervention by right of the United States, and
its bestowal of power upon the United States to take over a
relator's action, 31 U.S.C. § 3730(b)(2), make these principles
directly applicable to the FCA context that the Court confronts
today.

Attorney's Offices [sic], each has been reversed on appeal."
(citing Bolden, 353 F.3d at 879) (emphasis in original)).

Day asks the Court for an even more extreme remedy than the
already unprecedented measure of disqualifying an entire United
States Attorney's Office by requesting that the Court disqualify
the entire DOJ itself from representing the United States. Day
cites no caselaw or other support that would justify the
disqualification of the entire DOJ based on a conflict of interest
of one of its lawyers (even if one existed). Nor has the Court
located any authority to support that proposition. Instead,
caselaw supports the opposite conclusion. E.g., United States v.
Hasarafally, 529 F.3d 125, 128 (2d Cir. 2008) ("While a private
attorney's conflict of interest may require disqualification of
that attorney's law firm in certain cases, such an approach is not
favored when it comes to the office of a United States Attorney,
or, a fortiori, to the Department of Justice as a whole." (internal
citations omitted)). Indeed, in another case recently before this
Court, the decision was that an Assistant Attorney General's
conflict of interest could not "be imputed to the entire DOJ or to
the multiple state attorneys general who ha[d] signed the Amended
Complaint" in that case. United States v. Google, LLC, 692 F. Supp.
3d 583, 597-98 (E.D. Va. 2023) ("[I]f the disqualification of one
government agency could serve as the basis for the disqualification
of the DOJ as a whole, 'the administration of justice would be

irreparably damaged.'" (quoting <u>Grand Jury Subpoena of Ford v.</u> <u>United States</u>, 756 F.2d 249, 254 (2d Cir. 1985)); citing <u>Bolden</u>, 353 F.3d at 879)).

The decision in <u>Google</u> is persuasive. Disqualifying the DOJ based on Day's allegations alone, would "irreparably damage[]" the administration of justice. <u>Id.</u> Therefore, the Court holds that Day's allegations of a conflict of interest under Rule 1.7(a) do not support the removal of the DOJ as legal counsel to the United States in this FCA action.

Lastly, the Court is skeptical that Rule 1.7(a)'s design, which necessarily depends on a conflict derived from an attorney's representation of two or more clients, can apply here. The Attorney General, and through him, the DOJ, represents the interests of the United States as a whole. The United States, including its Treasury and all of its other agencies and employees, is a <u>single client</u> that the Attorney General and DOJ represents as a whole. <u>See</u> <u>Neville v. Yang</u>, No. 15-cv-1032, 2016 U.S. Dist. LEXIS 201377, at *4 (D.D.C. Mar. 18, 2016).

Federal statutes provide that the Attorney General, and the DOJ at her direction, is the Nation's chief-law-enforcement officer. 28 U.S.C. §§ 516, 517, 519. This authority comes with the "plenary power" to represent the United States in and direct "all litigation to which the United States or one of its agencies is a party." <u>Neville v. Lipnic</u>, 778 Fed. App'x 280, 288 (5th Cir. 2019)

(per curiam) (quoting <u>Marshall v. Gibson's Prod., Inc. of Plano</u>, 584 F.2d 668, 676 n.11 (5th Cir. 1978) (internal quotation marks omitted)). This is true whether the interests or positions of multiple agencies differ from each other. See <u>The Gray Jacket</u>, 72 U.S. 370, 371 (1867); <u>Yang</u>, 2016 U.S. Dist. LEXIS 201377, at *4. Therefore, it is logically incongruent to claim that the DOJ's representation of different entities of the United States creates a conflict of interest. It is not possible for the Attorney General and DOJ's representation "of one client [to] be directly adverse to another client" or for there to be a "significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client," Va. R. Prof'l Conduct 1.7(a), because the Attorney General and DOJ only represent <u>one client</u>: the United States. Therefore, the Court holds that the Attorney General and DOJ's legal representation of the United States does not create a cognizable conflict of interest that warrants removal.

### b. STATUTORY ANALYSIS

Aside from the inapplicability of the professional rules of ethics that Day cites for support to remove the DOJ as counsel to the United States, federal statutes also foreclose the possibility that the Court can remove the Attorney General and DOJ as the United States' legal counsel in this case even if a conflict of interest existed.

The analysis begins with the text of the FCA itself. The FCA does not discuss the role of the DOJ in <u>qui tam</u> lawsuits extensively. Indeed, the statute rarely mentions the Attorney General or DOJ by name, instead, using the more general terms "Government" or "United States," which do not necessarily refer to the Attorney General or DOJ. <u>See generally</u> 31 U.S.C. §§ 3729-3732.[15] However, in each statutory provision that does discuss the role of the Attorney General or DOJ specifically, the statute suggests that the Attorney General and DOJ are integral players in a <u>qui tam</u> action once the United States has intervened, which precludes the possibility of their removal.

Section 3730 contains all of the relevant references to the Attorney General and DOJ in the FCA. First, Section 3730(a), titled "Responsibilities of the Attorney General," states the following: "The Attorney General diligently shall investigate a violation under section 3729. If the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person." 31 U.S.C. § 3730(a). This provision only applies to FCA actions in which the Attorney General initiates an FCA lawsuit—without the

---

[15] Section 3733 does more regularly mention by name the Attorney General and DOJ, but that discussion is in the more limited context of using civil investigative demands for FCA actions. 31 U.S.C. § 3733. Those provisions do not implicate the discussion here and are therefore not addressed.

involvement of a <u>qui tam</u> plaintiff. So, it is not particularly useful for our purposes aside from the contrast that it presents.

The only other relevant place where the statute mentions a specific role for the Attorney General in FCA litigation is in the first subpart of Section 3730(b), titled "Actions by Private Persons." It contains the statute's core <u>qui tam</u> provisions and sets out the procedure for relators to bring FCA actions. 31 U.S.C. § 3730(b). The relevant portion of the statute provides that:

> A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. <u>The action may be dismissed only if the court and the Attorney General give consent to the dismissal and their reasons for consenting.</u>

<u>Id.</u> § 3730(b)(1) (emphasis added). Now, this provision applies whether the United States has decided to intervene in the action pursuant to 31 U.S.C. § 3730(c) or not. The Fourth Circuit has held, in an unpublished opinion, that "Section 3730(b)(1) is intended to reach voluntary dismissals and not dismissals based on substantive grounds." <u>United States ex rel. O'Malley v. Xerox Corp.</u>, No. 87-3173, 1988 U.S. App. LEXIS 20056, at *2 (4th Cir. May 9, 1988) (per curiam). That is, of course, the position that the Court finds itself in today upon the DISMISSAL MOTION, ECF No. 9, by the United States. Regardless, then, if the United States intervenes or not in a relator's action, the Attorney General must consent to a voluntary dismissal brought by any <u>qui tam</u> plaintiff

before the Court may dismiss the action.

Presume for a moment that Day's proposition (notwithstanding the statutory infirmities in the position) is correct, and the Court has authority to remove the DOJ as legal counsel to the United States. In practice, what would this mean? The United States remains in the action as an intervenor-plaintiff based on this Court's holding supra. The United States need only retain new counsel and move the Court to dismiss the claim anew pursuant to Section 3730(c)(2)(A). Before the Court could grant that voluntary dismissal motion, however, the Attorney General, under the statute, must still consent to the dismissal. 31 U.S.C. § 3730(b)(1). No voluntary dismissal could occur otherwise. There is simply no escaping the Attorney General's necessary role in a qui tam action at this stage of the litigation, conflict or no.[16]

Nonetheless, Section 3730(b)(1) does not require the Attorney General, or by extension, the DOJ, to represent the United States as intervenor in an FCA qui tam action. But, it does provide the

---

[16] Or imagine another scenario: The Court allows the case to proceed without the United States, Attorney General, and DOJ, and Day takes on the likely significant expense of conducting discovery in and prosecuting the case. After years of ongoing litigation, Day, for whatever reason, then decides that he no longer wants to pursue the case and instead seeks voluntary dismissal. The DOJ, through the Attorney General with her purported conflict of interest, must still consent to Day's hypothetical motion for voluntary dismissal. 31 U.S.C. § 3730(b)(1). The Attorney General and DOJ's role is definite and impossible for Day to avoid.

Attorney General, and hence the DOJ, with a powerful role in all
qui tam litigation—whether the United States intervenes or not.
That alone tells that, when the United States *does* choose to
intervene, Congress prefers that the DOJ should act as legal
counsel to the United States. The only other relevant provision
that specifically names the Attorney General or DOJ further
supports this position. That is Section 3730(d)(3).

Section 3730(d)(3) addresses the scenario in which the
relator who brought the qui tam action "planned [or] initiated"
the FCA violation. 31 U.S.C. § 3730(d)(3). In that scenario,
whether the United States intervenes or not, the Court may reduce
any proceeds that the relator could receive to zero. Id. The
relator also "shall be dismissed from the civil action." Id. If
such dismissal occurs, it "shall not prejudice the right of the
United States to continue the action, represented by the Department
of Justice." Id. (emphasis added). The emphasized portion of this
section speaks in the imperative: that the DOJ shall represent the
United States if the United States chooses to intervene in the
lawsuit. This too teaches that Congress prefers that the DOJ should
act as the United States' legal counsel once it has intervened in
a qui tam action.

Other statutes reinforce that preference. For example, 28
U.S.C. § 516 provides, in full: "Except as otherwise authorized by
law, the conduct of litigation in which the United States, an

agency, or officer thereof is <u>a party, or is interested</u>, and securing evidence therefor, <u>is reserved to officers of the Department of Justice, under the direction of the Attorney General.</u>" 28 U.S.C. § 516 (emphasis added). The United States is an irremovable party from a <u>qui tam</u> action once it has intervened. <u>Supra</u>. Even if the Court is incorrect and the United States <u>is</u> a removable party, it undeniably remains a "real party in interest" in the <u>qui tam</u> suit, <u>Polansky</u>, 143 S. Ct. at 1728, 1734 n.4, which likewise entitles it to the DOJ's representation at the Attorney General's direction. 28 U.S.C. § 516. Section 519 further supports this position:

> Except as otherwise authorized by law, the <u>Attorney General shall supervise all litigation to which the United States</u>, an agency, or officer thereof <u>is a party</u>, and <u>shall direct</u> all United States attorneys, assistant United States attorneys, and special attorneys appointed under section 543 of this title in the discharge of their respective duties.

28 U.S.C. § 519 (emphasis added). Congress chose even stronger language here than in Section 516. By using "shall," the statute <u>requires</u> the Attorney General to oversee <u>qui tam</u> litigation where the United States intervenes as a party, such as the present case. <u>Id.</u>

Section 519 does not contain the same "or is interested" language as Section 516. <u>Compare</u> 28 U.S.C. § 519, <u>with id.</u> § 516. However, that is irrelevant for our purposes. The Court has held, based on an extensive investigation of the history, intent,

purpose, and text of the statute, that the United States is an irremovable party once it intervenes in a relator's <u>qui tam</u> lawsuit, as here. <u>Supra</u>. So long as it remains a party, Sections 516 and 519 provide that the DOJ represents the United States and that the Attorney General oversee the litigation on its behalf. 28 U.S.C. §§ 516, 519.[17]

Both Section 516 and 519 begin with the phrase "[e]xcept as otherwise authorized by law," which creates an exception to their directives where statutes allow for alternative representation. 28 U.S.C. §§ 516, 519. No such exceptions exist in the FCA. Although the FCA does authorize a relator to conduct parts of the litigation, the statutory analysis (<u>supra</u> Part III.A.1.a) demonstrates that those powers do not usurp the United States' statutory grant—as a party or real party in interest—to conduct the litigation. <u>See also Marshall</u>, 584 F.2d at 676 (noting that the Attorney General "is vested with plenary power over all litigation to which the United States or one of its agencies is a party" (citing 28 U.S.C. §§ 516, 519; <u>Interstate Com. Comm'n v. S. Ry. Co.</u>, 543 F.2d 534, 535-36 (5th Cir. 1976)). Day has identified,

---

[17] Section 517 provides similar support: "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to <u>attend to the interests of the United States in a suit</u> pending in a court of the United States, or in a court of a State, or <u>to attend to any other interest of the United States</u>." 28 U.S.C. § 517 (emphasis added).

and the Court has found, no exception to contravene that reality.

Because these statutes preclude the possibility of removing the DOJ as legal counsel to the United States in this action,[18] it is not necessary to address the second part of Day's argument that the Court must require the United States to retain independent counsel.

### c. CONSTITUTIONAL ANALYSIS

The United States argues[19] that the Constitution also forecloses the possibility that Day can remove the DOJ as the United States' legal counsel in this action. In particular, the United States takes the view that the Court would violate the constitutional separation of powers principle if it removed the DOJ as legal counsel to the United States and required it to retain other counsel. That argument rests on the decisions of several courts of appeals that have upheld the constitutionality of the FCA's qui tam provisions. Id. (citing United States ex rel. Kelly v. Boeing Co., 9 F.3d 743 (9th Cir. 1993); United States ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148 (2d

---

[18] This rule, of course, is itself subject to the Court's holding supra that, while it may not disqualify the entire DOJ based on the allegations made here, all attorneys, including individual government attorneys from the DOJ and Assistant United States Attorneys, that appear before this Court are subject to the Local Rules of this District as well as the Virginia Rules of Professional Conduct.

[19] ECF No. 54, at 10-12.

Cir. 1993); <u>United States ex rel. Taxpayers Against Fraud v. Gen.</u> <u>Elec. Co.</u>, 41 F.3d 1032 (6th Cir. 1994)). Generally, defendants in those cases argued that the <u>qui tam</u> provisions violate the separation of powers because Congress impermissibly assigned the Executive Branch's law enforcement powers to private persons. Such an assignment, the argument goes, impinges the President's ability, through the Attorney General and DOJ, to "take Care that the Laws be faithfully executed." <u>E.g.</u>, <u>Taxpayers Against Fraud</u>, 41 F.3d at 1041-42; U.S. Const. art. II.

The five courts of appeals that have addressed the issue have disagreed that the FCA <u>qui tam</u> provisions' empowerment of private persons to sue on behalf of the United States violates the separation of powers. <u>Kelly</u>, 9 F.3d at 755; <u>Taxpayers Against</u> <u>Fraud</u>, 41 F.3d at 1041; <u>Kreindler</u>, 985 F.2d at 1155; <u>Riley v. St.</u> <u>Luke's Episcopal Hosp.</u>, 252 F.3d 749, 753-55 (5th Cir. 2001) (en banc); <u>United States ex rel. Stone v. Rockwell Int'l Corp.</u>, 282 F.3d 787, 805-07 (10th Cir. 2002) (limiting its holding to the factual context of the case). Instead, channeling at least in part the Supreme Court in <u>Morrison v. Olson</u>, those courts have held that the FCA provides "sufficient control" to the Executive Branch over relators' FCA actions to survive constitutional scrutiny. <u>E.g.</u>, <u>Kelly</u>, 9 F.3d at 750-55 (quoting <u>Morrison v. Olson</u>, 487 U.S. 654, 696 (1988)); <u>Taxpayers Against Fraud</u>, 41 F.3d at 1041. That control derives from the FCA's provisions that authorize the United

States to, _inter alia_, intervene and prosecute the case pursuant to the direction of the Attorney General, limit the relator's involvement in the action, dismiss or settle the case over the relator's objections, and conduct discovery. _E.g._, _Kelly_, 9 F.3d at 753; _Taxpayers Against Fraud_, 41 F.3d at 1041; _see also supra_ Part III.A.1.a. Consequently, the FCA "gives the Attorney General sufficient means of controlling or supervising relators to satisfy separation of powers concerns." _Kelly_, 9 F.3d at 755.

Based on this precedent, the United States argues that removing the DOJ as legal counsel to the United States in this _qui tam_ action would violate the constitutional separation of powers because the very constitutionality of the _qui tam_ provisions is predicated on the ability of the Executive Branch, through the DOJ, to control the relator's suit if it so chooses. ECF No. 54, at 12. Also, other courts have held that potential separation of powers concerns would arise if entire United States Attorney's Offices or the DOJ itself were removed as counsel for the United States in cases where the United States is a party. _E.g._, _Bolden_, 353 F.3d at 875 ("Disqualifying the entire [United States Attorney's] [O]ffice from representing the government raises important separation of powers issues."); _see also Google_, 692 F. Supp. 3d at 597-98 ("[I]f the disqualification of one government agency could serve as the basis for the disqualification of the DOJ as a whole, 'the administration of justice would be irreparably

damaged.'" (citations omitted)).

The Fourth Circuit has not had an opportunity to address the question. However, these other appellate courts have passed on the fundamental question respecting removal of the DOJ as counsel to the United States in FCA qui tam actions. The Court finds the reasoning of the Second, Fifth, Sixth, Tenth, and Eleventh Circuits on the constitutionality of the qui tam provisions, and the consequences for removal of the DOJ therefrom, as persuasive. Moreover, this Court has held that statutes with similar qui tam provisions to those in the FCA did not violate the constitutional separation of powers because of the greater degree of control over qui tam actions that the Executive Branch possesses compared to the relator. Pequignot v. Solo Cup Co., 640 F. Supp. 2d 714, 724-28 (E.D. Va. 2009) (holding that the qui tam provisions in 35 U.S.C. § 292(b) do not violate the constitutional separation of powers in part because the Executive Branch, through the Attorney General, retains sufficient control over a relator's qui tam action, similar to the FCA (citing Riley, 252 F.3d at 753-54; Kelly, 9 F.3d at 755; Taxpayers Against Fraud, 41 F.3d at 1041; Kreindler, 985 F.2d at 1155; Stone, 282 F.3d at 806)).

If the Court were to agree with Day and remove the DOJ as the United States' legal counsel in this qui tam action, it would effectively strip the Executive Branch of any control in prosecuting the action that is brought in its name. Consequently,

the Executive Branch would lack "sufficient control" over the action to satisfy the carefully calibrated separation of powers inherent within our constitutional system. See Kelly, 9 F.3d at 755; see also Stone, 282 F.2d at 806 ("Given that the Government was permitted to intervene, we remain unconvinced by [the] contention that the presence of a qui tam relator in the litigation so hindered the Government's prosecutorial discretion as to deprive the Government of its ability to perform its constitutionally assigned responsibilities." (citing Morrison, 487 U.S. at 695-96) (emphasis added)).

The situation before the Court is materially different from the situation contemplated by the FCA where the United States, and by extension the Attorney General and DOJ, chooses not to intervene ab initio. In such a scenario, Day retains the "right to conduct the action," but the United States may still exert at least some influence over it, including limiting discovery upon a showing of cause and retaining the ability to intervene later with court approval. 31 U.S.C. § 3730(b)(4)(B), (c)(3)-(4). The Court would not simply be recreating this scenario if it granted Day's REMOVAL MOTION. Instead, it would be taking the very choice of intervention away from the United States. The United States' decision initially to intervene and to take over the action itself is fundamental to the question of whether the United States possesses sufficient control to avoid a constitutional separation of powers problem.

See, e.g., Stone, 282 F.2d at 806 ("[W]e agree with the Fifth, Sixth, and Ninth Circuits, and hold that at least where the Government intervenes, the qui tam provisions of the FCA do not violate the separation of powers by transgression of the Take Care Clause."); Kelly, 9 F.3d at 753 ("Under the FCA, the Executive Branch can control a qui tam relator's exercise of prosecutorial powers in several ways. The government can intervene in a case and then take primary responsibility for prosecuting the action."). Allowing Day to remove the DOJ as a whole as legal counsel to the United States—compared to individual government attorneys who may possess personal conflicts warranting their individual removal—after the United States has exercised its statutorily authorized ability to intervene in the action (presumably at the direction of that very legal counsel) would itself undermine the power of the Executive Branch to direct litigation brought in the United States' name, notwithstanding the potential influence it could exert as a non-party to the action under the statute.

The United States, at the direction of the DOJ, must maintain its prosecutorial discretion to intervene in an FCA qui tam action. The Court must respect its decision to do so. Removing the DOJ as legal counsel to the United States after intervention effectively renders that power to intervene a nullity and would violate the constitutional separation of powers. The Court declines the

invitation to achieve that result.[20] For this reason, and those others asserted, *supra*, the Court will deny the REMOVAL MOTION, ECF No. 37.

### B. UNITED STATES' MOTION TO DISMISS

Now, it is necessary to resolve the United States' DISMISSAL MOTION, ECF No. 9. The United States seeks dismissal of Day's COMPLAINT pursuant to 31 U.S.C. § 3730(c)(2)(A) and Fed. R. Civ. P. 9(b). It also argues that sovereign immunity requires dismissal. Because sovereign immunity is a jurisdictional doctrine that "deprives federal courts of jurisdiction to hear claims" against the immune party, Cunningham v. Gen. Dynamics Info. Tech., Inc., 888 F.3d 640, 649 (4th Cir. 2018), the first question to be addressed is whether sovereign immunity applies. Va. Dep't of Corr. v. Jordan, 921 F.3d 180, 187 (4th Cir. 2019).

The United States argues that, although Day goes through great pains to never name the United States, its agencies, or officers, as defendants to the action, this is simply "creative pleading" on Day's part. Instead, the United States argues that Day has alleged

---

[20] Although the Court rejects Day's argument to remove the entire DOJ or Attorney General on these grounds, it maintains its authority to remove individual government attorneys, including Assistant United States Attorneys, Assistant Attorney Generals, special prosecutors, or the Attorney General herself in the unique and special circumstances where the individual may possess a conflict of interest in violation of the Local Rules of this District and the Virginia Rules of Professional Conduct.

facts and made arguments that implicate the United States as a real-defendant-in-interest and that Day's requested relief would restrain the United States' ability to administer federal laws and regulations. ECF No. 43, at 5. However, while Day does allude to wrongdoing on behalf of the DLA and its employees in their official capacities, the remedies that Day requests would only impose demands on the nongovernmental Defendants. Therefore, sovereign immunity does not bar Day's suit. The DISMISSAL MOTION was not granted on this ground.

The remaining questions are whether the action must be dismissed under Section 3730(c)(2)(A) or Fed. R. Civ. P. 9(b). Each will be considered in turn.

First, the United States argues that it has the ability to dismiss Day's COMPLAINT based on its statutory authority under Section 3730(c)(2)(A) alone. It reads the Supreme Court's recent decision in Polansky as allowing the United States as intervenor to voluntarily dismiss qui tam relators' FCA complaints without providing any reasons at all; instead, says the United States, all it must do is move for dismissal and the Court must grant that dismissal. ECF No. 10, at 1-2. The United States' reading of Polansky, and the deference that it requires district courts to give to the United States in motions for voluntary dismissal, is simply too broad. Polansky does not stand for the proposition that the United States need not provide any reasoning before it can

dismiss a case under Section 3730(c)(2)(A). The deference given to the United States mandated by Polansky is not absolute. However, the United States is correct that, in this case, dismissal is warranted under Section 3730(c)(2)(A) based on Polansky and recent decisions of the Fourth Circuit. Therefore, the Court will grant the DISMISSAL MOTION on this ground.

Second, the United States argues that Day has failed adequately to plead with sufficient particularity facts and allegations that meet Fed. R. Civ. P. 9(b)'s heightened pleading standard for fraud claims. Rule 9(b) requires that plaintiffs in fraud claims plead each element of fraud with "particularity." Fed. R. Civ. P. 9(b). Where a plaintiff fails to do so, the Court must dismiss the case. Id. Day's COMPLAINT does not meet the particularity requirements set forth by Rule 9(b) because it fails to specify "the who, what, when, where and how of the alleged fraud." United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks omitted) (citations omitted). Therefore, the Court will grant the DISMISSAL MOTION on this ground as well.

Ordinarily, it is preferable to articulate a single basis for decision and, conversely, to refrain from making alternative holdings. Karsten v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc., 36 F.3d 8, 11-12 (4th Cir. 1994). However, considering that this case presents questions of first impression,

the Court deems it appropriate to address each argument for relief
posed by the United States. Two of those arguments present a basis
upon which the Court may and does grant relief. Accordingly, the
Court will grant the DISMISSAL MOTION, ECF No. 9.

### 1. SOVEREIGN IMMUNITY DOES NOT BAR DAY'S SUIT AND THEREFORE DOES NOT REQUIRE DISMISSAL

Sovereign immunity is a jurisdictional doctrine that
"deprives federal courts of jurisdiction to hear claims" against
the immune party. Cunningham, 888 F.3d at 649. Therefore, when the
defense is presented, the Court must generally first decide whether
sovereign immunity applies before addressing subsequent grounds
for dismissal. Jordan, 921 F.3d at 187.

Sovereign immunity "shields the Federal Government and its
agencies from suit" unless the United States waives that immunity
and consents to being sued. Fed. Deposit Ins. Corp. v. Meyer, 510
U.S. 471, 475 (1994); United States v. Sherwood, 312 U.S. 584, 586
(1941). The sovereign immunity of the United States itself extends
to its agents and officers when acting in their official
capacities. Hendy v. Bello, 555 Fed. App'x 224, 226 (4th Cir. 2014)
(per curiam) (referencing Will v. Mich. Dep't of State Police, 491
U.S. 58, 71 (1989); Larson v. Domestic & Foreign Com. Corp., 337
U.S. 682, 687 (1949)). Congress can waive the United States'
sovereign immunity by consent via statute; however, Congress must
not "impl[y] but [instead] unequivocally express[]" that waiver.

Lancaster v. Sec'y of the Navy, 109 F.4th 283, 293 (4th Cir. 2024) (quoting Randall v. United States, 95 F.3d 339, 345 (4th Cir. 1996)). Courts must "strictly construe[]" that waiver "in favor of the sovereign." Welch v. United States, 409 F.3d 646, 650-51 (4th Cir. 2005) (quoting Lane v. Pena, 518 U.S. 187, 192 (1996)).

The party asserting sovereign immunity has the burden of proof to demonstrate that the immunity applies. Hutto v. S.C. Ret. Sys., 773 F.3d 536, 543 (4th Cir. 2014). The party arguing against the application of sovereign immunity has the "burden to show that an unequivocal waiver of sovereign immunity exists and that none of the statute's waiver exceptions apply to [its] particular claim." Welch, 409 F.3d at 651 (citing Williams v. United States, 50 F.3d 299, 304 (4th Cir. 1995)).

In this case, the United States argues that sovereign immunity should apply, and, therefore, it bears the burden to prove that defense. The United States' argument is not a straightforward one, however, because Day does not name the federal government or any agency, instrumentality, or employee thereof as a defendant in the action. Recognizing that obvious fact, the United States argues instead that Day has "effectively" brought the suit "against a federal agency (DLA) as an unnamed defendant," making the federal government an unnamed defendant-in-interest. ECF No. 43, at 4. The United States grounds this argument on the view that the COMPLAINT "only challenges the propriety of DLA's procurement methods" with

the sole intent of restraining those methods, which would improperly interfere with the public administration of federal law. Id. at 5 (referencing Dugan v. Rank, 372 U.S. 609, 620 (1963)). With this primary object in view, the United States argues, Day's decision to not name the United States, DLA, or federal employees as defendants is merely an attempt creatively to plead his way out of a dismissal because of sovereign immunity—an unacceptable consequence. Id. (citing Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 285 (1983) (quoting Brown v. Gen. Servs. Admin., 425 U.S. 820, 833 (1976))[21]; Cunningham v. Lester, 990 F.3d 361, 368 (4th Cir. 2021) ("Allowing [the Plaintiff] to sidestep the substantive focus of sovereign immunity doctrine through the subterfuge of artful pleading would open the door to repeat plays, in which the same pleading tactics are used, again and again, to hamstring other government agencies.")). Therefore, the United States asks the Court to recognize the United States as a real-defendant-in-interest and to grant the DISMISSAL MOTION because the United States is sovereignly immune from Day's FCA lawsuit.

Day steadfastly denies the United States' accusations of

---

[21] In its briefing, the United States mistakenly cites this case as Block v. United States, 464 U.S. 273, 285 (1983). Based on the Court's review, it is believed that the United States meant instead to refer to the Block case cited by the Court above.

engaging in creative pleading to avoid an immunity defense. ECF No. 47, at 3-4. He reiterates that he is not prosecuting, or seeking recovery against, any federal entity. Day's argument is full of equivocations, however. While not laying liability on the United States or DLA, he does argue that the Defendants, alongside "[i]ndependent actors within the DLA are schematically flouting statutory and regulatory law." Id. at 3. Nonetheless, he "concedes . . . that the United States of America and the DLA, as an independent official agency, are not publicly or officially liable for violating the False Claims Act." Id. at 4. He goes on to argue that the United States' argument would only hold weight if he had named DLA employees in their official capacities as defendants. However, even in that situation, he argues that Congress has abrogated sovereign immunity: "[T]he FCA attaches liability to 'any person' who engages in the culpable behavior proscribed by 31 U.S.C. § 3729(a). The term 'any person' is a Congressional waiver of sovereign immunity insofar as 'any person' may include DLA directors and employees who are personally complicit." Id. (quoting 31 U.S.C. § 3729(a)). He presents no other evidence or argument that Congress abrogated sovereign immunity, relying entirely on the "any person" language. He concludes by reiterating that he is not bringing a lawsuit against the DLA or its employees in either their official or personal capacities and therefore neither sovereign nor qualified immunity are relevant. Id.

Whether sovereign immunity bars Day's lawsuit depends entirely on whether the United States, DLA, or its employees in their official capacity are real-defendants-in-interest even though unnamed in the COMPLAINT. The Supreme Court has given recent guidance on this topic:

> Our cases establish that, in the context of lawsuits against state and <u>federal employees or entities</u>, courts should look to whether the sovereign is the <u>real party in interest</u> to determine whether sovereign immunity bars the suit. In making this assessment courts <u>may not simply rely on the characterization of the parties in the complaint</u>, but rather must determine in the first instance <u>whether the remedy sought is truly against the sovereign</u>. If, for example, an action is in essence against a State even if the State <u>is not a named party</u>, then the State is the real party in interest and is <u>entitled to invoke the Eleventh Amendment's protections</u> [to sovereign immunity]. For this reason, an arm or instrumentality of the state generally enjoys the same immunity as the sovereign itself.

<u>Lewis v. Clarke</u>, 581 U.S. 155, 161-62 (2017) (alteration and emphasis added) (citations omitted). So, if Day's remedy is "truly against the sovereign," then the United States is a real-defendant-in-interest and sovereign immunity bars the suit. <u>Id.</u>

Throughout his COMPLAINT and briefing, Day describes the DLA and its officers as if they are the wrongdoers alongside the nongovernmental Defendants. ECF No. 1, ¶ 15 ("The Defendants and DLA contracting officers falsely claim that these contracts for replacement parts purchases are competitive."); <u>id.</u> ¶ 17 ("DLA contracting officers, working with the Defendants . . . are acting in violation of law and regulation when they award these Sole

Source contracts as competitively bid contracts."); ECF No. 38, at 4 ("[T]he DLA is a United States agency and . . . participat[es] in the violative conduct."); id. ("[T]he United States effectively concedes that the DLA 'is in on it' by basing its argument for dismissal on the fact that the DLA is an active participant in the bid submission process."); id. at 5 ("In sum, the Relator has alleged exactly what it is that the United States cites as its only argument: the DLA and the Defendants are complicit in a pattern and practice of intentionally violating the laws . . . and, as a result, the Defendants are unlawfully profiting off of the backs of taxpayers."); id. at 6 ("In this case, Mr. Day alleges that a United States agency is an active participant in a process which is unlawful and it has resulted in the submission of false claims by the Defendant [sic]."); id. at 7 ("The United States, by way of the DOJ, is concurrently serving the interests of the American treasury . . . while also representing the DLA as a federal agency that is alleged to be complicit or acting in concert with the Defendants."); id. ("The DOJ cannot be expected to fairly and ethically investigate the inner-workings of the DLA and the communications between its officers when the DOJ also has a responsibility to defend the DLA in actions involving bid procurement and procedures."). Together, these descriptions present strong evidence that Day views the United States, in the form of the DLA and its officers, as an unnamed defendant, which

would allow a potential defense of sovereign immunity. However, the inquiry must remain focused on the remedies sought and whether those remedies are "truly against the sovereign" rather than just on how Day describes the purported wrongdoing at issue. <u>Lewis</u>, 581 U.S. at 161.

Day demands three remedies: (1) Production by the Defendants of all contracts awarded to them by the DOD along with the full procurement history of those contracts; (2) A list of the Defendants' authorized distributors to the DOD; and (3) All the benefits that 31 U.S.C. § 3730 provides to relators. ECF No. 1, at 5 (citing 31 U.S.C. §§ 3730, 3733). None of those three remedies are "truly against the sovereign." <u>Lewis</u>, 581 U.S. at 161. None of them would impose injunctive relief on, or elicit monetary relief from, the United States, DLA, or any DLA officer in an official capacity. Instead, the remedial burdens rest solely on the nongovernmental Defendants. If the Court found in Day's favor, the nongovernmental named Defendants would be the ones required to disclose copies of their contracts and relevant procurement histories with the DOD to Day (and the United States if it chose to remain in the suit). Any list of authorized distributors would come from the Defendants, not the United States. Any monetary relief from the alleged false claims would also only come from the Defendants and be paid in minority part to Day and in majority part to the United States itself as the primary benefactor of <u>qui</u>

tam FCA suits. 31 U.S.C. § 3730(d). Contrary to the United States'
assertions, Day's requests for relief do not seek to enjoin or
otherwise "restrain" the DLA or its officers' policies or
practices.

Therefore, although Day does allude to wrongdoing by the DLA
and its officers, he seeks to hold accountable, and demands
remedies from, solely private parties: the named Defendants. The
COMPLAINT is reasonably read so that it does not designate any
federal agency or official as a real-defendant-in-interest.
Therefore, the United States has failed to carry its burden to
show that sovereign immunity bars Day's action.[22]

## 2. THE POLANSKY & DOE STANDARD FOR VOLUNTARY DISMISSAL

Having held that sovereign immunity does not bar Day's action,

---

[22] Having found that sovereign immunity does not bar Day's action,
the Court need not address Day's alternative argument that Congress
abrogated sovereign immunity for federal officers when acting in
their official capacity by using the term "any person" in Section
3729(a). Nonetheless, the Court recognizes that a great deal of
authority demonstrates that Congress did not "unequivocally" waive
sovereign immunity for federal agencies or employees, through this
language or otherwise. See United States ex rel. Milam v. Univ. of
Tex. M.D. Anderson Cancer Ctr., 961 F.2d 46, 50 n.3 (4th Cir.
1992); see also Boese & Baruch, supra, § 2.09, at n.1651
(collecting cases including Mestek v. Lac Courte Oreilles Cmty.
Health Ctr., 72 F.4th 255 (7th Cir. 2023); Shaw v. United States,
213 F.3d 545, 548 (10th Cir. 2000); Doe v. Doe, 134 Fed. App'x
229, 230 (10th Cir. 2005) (citing Galvan v. Fed. Prison Indus.,
Inc., 199 F.3d 461, 468 (D.C. Cir. 1999))). But cf. United States
ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1420-
22 (9th Cir. 1991) (allowing a FCA qui tam suit to proceed against
federal employees).

it is now time to address the United States' other two bases for dismissal.

### a. THE UNITED STATES HAS MET ITS BURDEN TO DISMISS THE COMPLAINT PURSUANT TO SECTION 3730(c)(2)(A) OF THE FCA

In qui tam actions under the FCA, upon intervention, the United States may "dismiss the action notwithstanding the objections of the [relator] if the [relator] has been notified by the Government of the filing of the motion and the court has provided the [relator] with an opportunity for a hearing on the motion." 31 U.S.C. § 3730(c)(2)(A). In Polansky, the Supreme Court held that district courts should assess a "[Section 3730(c)](2)(A) motion to dismiss using [Fed. R. of Civ. P.] 41's standards." Polansky, 143 S. Ct. at 1733. For voluntary dismissals, Rule 41 provides that a plaintiff (including intervenors, like the United States) may dismiss an action without a court order by filing "a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment." Fed. R. Civ. P. 41(a)(1)(A)(i).

Polansky addressed a motion to dismiss by the United States in the post-answer stage of litigation. During that stage, the Supreme Court held that district courts must afford the United States' reasons to dismiss "substantial deference" and "should think several times over before denying a motion to dismiss." Polansky, 143 S. Ct. at 1734. It continued: "If the Government

72

offers a <u>reasonable argument</u> for <u>why the burdens</u> of continued litigation <u>outweigh</u> its <u>benefits</u>, the court <u>should grant</u> the motion. And that is so <u>even if the relator presents a credible assessment to the contrary</u>." <u>Id.</u> (emphasis added). The Supreme Court, however, did not provide clear guidance for how district courts should address <u>pre</u>-answer motions to dismiss.

The Fourth Circuit Court of Appeals recently provided that guidance. In <u>United States ex rel. Doe v. Credit Suisse AG</u>, the Fourth Circuit stated that the United States is "entitled to <u>even greater deference</u>" for <u>pre</u>-answer motions to dismiss pursuant to Rule 41(a)(1) because no court order is required for dismissal—unlike for <u>post</u>-answer motions to dismiss. 117 F. 4th at 161-62 (4th Cir. 2024) (emphasis added). That deference, however, is not absolute.

The United States argues that, by virtue of <u>Polansky</u> and <u>Doe</u>, it need not provide <u>any</u> detailed discussion of its reasons to justify its DISMISSAL MOTION because it comes before the Defendants have filed an answer or motion for summary judgment. ECF No. 40, at 1; ECF No. 51, at 1. The United States' reading of <u>Polansky</u> and <u>Doe</u> would have the Court hold that the United States can simply dismiss Day's COMPLAINT because it wants to. No justification required. That reading of <u>Polansky</u> and <u>Doe</u>, however, is a reach too far.

The analysis begins with <u>Polansky</u> in which the Supreme Court

quite clearly held that the United States must provide "reasonable argument[s]" before a district court can grant its motion to dismiss. Polansky, 143 S. Ct. at 1734 (emphasis added). True, Polansky instructs that those reasons must be afforded "substantial deference," but, nonetheless, the arguments must still be given and they must be reasonable. Id. Now, as the United States today points out, ECF No. 40, at 1, Polansky dealt with a motion to dismiss in the post-answer stage of litigation, which is governed by the more demanding procedures of Fed. R. Civ. P. 41(a)(2). However, immediately after establishing the standard of review for these motions, the Supreme Court, "in the interest of providing guidance . . . put that standard of review [(the Rule 41(a)(2) standard)] to the side," and went on to assess the reasons given by the United States because it was merely simpler to "say that the District Court got this one right." Id. at 1735. Consequently, what the Court today takes away from the Supreme Court's "guidance" is that the United States must provide reasonable justifications for dismissal not just in the post-answer stage but so too when moving to dismiss a case before an answer or summary judgment has been filed pursuant to Rule 41(a)(1).

That conclusion is supported also by the Fourth Circuit's holding in Doe in which our Court of Appeals acknowledged that Polansky stands for the proposition that the United States "merely

needs to <u>provide reasons for its assessment that the suit would not 'vindicate' its interests</u>," warranting dismissal under Rule 41(a)(2). <u>Doe</u>, 117 F.4th at 161 (emphasis added). It then held that, in the <u>pre</u>-answer stage at issue in Rule 41(a)(1), the United States receives "even greater deference" for its motions to dismiss. <u>Id.</u> Before affirming the district court's decision to dismiss Doe's complaint, however, the Fourth Circuit reviewed the United States' "valid reasons for moving to dismiss the action." <u>Id.</u> at 162. So, even though district courts must grant the United States "even greater deference" for a dismissal motion brought under Rule 41(a)(1) compared to those brought under Rule 41(a)(2), the United States must nonetheless provide valid justification before dismissal is proper even at the pre-answer stage. The Court therefore rejects the United States' argument that it is due absolute deference and need not provide any reasons to justify its DISMISSAL MOTION simply because the Defendants have yet to file an answer or motion for summary judgment.

In this case, the United States has provided several reasons that, according to it, warrant dismissing Day's COMPLAINT. Pursuant to <u>Polansky</u> and <u>Doe</u>, the Court reviews those reasons with "even greater" than "substantial deference" given to the United States. <u>Doe</u>, 117 F.4th at 161-62 (citing <u>Polansky</u>, 143 S. Ct. at 1734). After considering the United States' reasons for dismissal, the Court holds that they are sufficiently reasonable to justify

granting the DISMISSAL MOTION.

In Polansky, the United States concluded that the following reasons justify dismissal: (1) that the potential benefits did not outweigh the "significant costs of future discovery" necessary to resolve the dispute; (2) that discovery would likely implicate and disclose privileged documents; and (3) that the "suit had little chance of success on the merits." Polansky, 143 S. Ct. at 1735 (emphasis added). Polansky disputed these reasons, arguing that the United States was foregoing recovering potentially billions of dollars by not pursuing the action. Id. Nonetheless, the district court agreed with the reasons given by the United States, holding that its views of the costs and benefits for pursuing the litigation were reasonable. The Supreme Court affirmed, reasoning that even "credible assessment[s] to the contrary" of the United States' reasons for dismissal should not overcome the United States' conclusions. Id. at 1734-35.

In Doe, the United States put forth almost identical reasons for dismissal as it had offered in Polansky, including: (1) that discovery would implicate privileged matters, including prosecutorial decisionmaking; (2) that discovery would interfere with ongoing discussions between the United States and the defendant on plea-agreement matters; and (3) that the costs outweighed the benefits of litigation such that continuing to pursue the action would waste governmental resources. Doe, 117

F.4th at 162-63. The district court held that these reasons were sufficiently valid to grant dismissal. The Fourth Circuit affirmed. Id.

In today's case, the United States lays out five distinct reasons that, in its view, justify granting the DISMISSAL MOTION. Those reasons include: (1) Day does not allege a false claim but, instead, only takes issue with a particular procurement method used by the DLA; (2) Day never alleges fraud against the DLA; (3) Day's claim lacks merit based on the United States' internal investigation; (4) Dismissal serves the public interest; and (5) Day's allegations do not warrant continued governmental expenditures. ECF No. 40, 5-6. The United States also elaborates on some of those reasons. It provides a strong argument that the DLA's procurement practices are, in fact, legal and notes that Day provides practically no specifics on the fraud that the Defendants are allegedly committing. It also argues that the Court should skeptically view Day's argument in the first instance because Day has been convicted of the very allegations that he raises today and has been admonished by multiple federal courts for his litigiousness that often borders on, or crosses, the line into frivolity. Id. at 9-15 (collecting cases). Lastly, the United States argues that the costs of this litigation outweigh its benefits. Specifically, the United States has shown that Day's sweeping COMPLAINT would require production of practically every

contract that the DLA has entered into since 2003. On average, the DLA enters <u>9,000 contracts per day</u>, meaning that discovery would require producing and reviewing tens of millions of contracts. This would further include millions of accompanying documents and electronically-stored information, many of which would likely implicate privileged information. <u>Id.</u> at 16-18.

These justifications mirror, and in many respects, are identical to, the reasons that the Supreme Court and Fourth Circuit found sufficient to dismiss the relators' claims in <u>Polansky</u> and <u>Doe</u>. Like the defendant in <u>Polansky</u>, Day argues that the United States is ignoring the potentially significant relief it could reap from the Defendants if the suit is successful and the fact that Day has offered to handle the logistics and cost of discovery himself. ECF No. 41, at 3, 7. However, even if Day's contrary assessment is credible, the United States' reasons are valid ones that warrant deference at the present posture. After giving the reasons offered by the United States the substantial deference to which they are entitled at the pre-answer stage of this FCA action, the Court holds that the United States has provided sufficiently reasonable justifications to grant the DISMISSAL MOTION, ECF No. 9.

**b. THE COURT'S HEARING ON OCTOBER 29, 2024, SATISFIES <u>POLANSKY'S</u> REQUIREMENT FOR AN EVIDENTIARY HEARING BEFORE DISMISSAL**

In <u>Polansky</u>, the Supreme Court noted that district courts

must hold a hearing pursuant to Section 3730(c)(2)(A) before granting a motion to dismiss under Rule 41(a)(1). Polansky, 143 S. Ct. at 1734 n.4. At a minimum, a court must conduct such a hearing to "inquire into allegations that a dismissal [will] 'violate the relator's rights to due process or equal protection.'" Id. (quoting United States ex rel. Polansky v. Exec. Health Res., 17 F.4th 376, 390 n.16 (3d Cir. 2021) (alteration added) original alteration omitted)); Doe, 117 F.4th at 161. It is important to state clearly what this holding demands of district courts. The purpose of such a hearing is not to address the merits of any potential constitutional violation that a relator may raise. It does not operate as a backdoor to allow relators to allege new constitutional claims never before asserted in the litigation. Instead, the required hearing is to address the specific question of whether dismissing the relator's complaint without a hearing itself would violate their constitutional rights to due process or equal protection. Polansky, 143 S. Ct. at 1734 n.4. It is to that question that the Court now turns.

Day alleges that the Court will violate his substantive due process rights by granting the DISMISSAL MOTION. ECF No. 53, at 3. Specifically, he argues that the United States is choosing to not properly enforce federal law in violation of Article VI of the Constitution. ECF No. 41, at 2 (citing U.S. Const. art. VI; 28 U.S.C. § 544). This inaction derives from the United States'

alleged conflict of interest in simultaneously representing the interests of the DLA and the United States Treasury. ECF No. 38, at 6-7; ECF No. 53, at 3. Therefore, before the Court can dismiss the COMPLAINT, Day argues, it must hold a hearing to ensure that it does not violate his rights to due process under the Fifth and Fourteenth Amendment. U.S. Const. amends. V, XIV.

On October 29, 2024, the Court held a hearing with counsel representing Day and the United States. The parties discussed the potential constitutional issues implicated by the DISMISSAL MOTION, including Day's claims that dismissal would violate his constitutional rights. At that hearing, counsel for both parties agreed that the hearing satisfied Polansky's hearing requirements for voluntary dismissal motions under Section 3730(c)(2)(A) and Rule 41(a)(1).[23] Therefore, the Court can and will dismiss this case without violating Day's constitutional rights. The Court need not address the merits of Day's underlying substantive due process claim. It is enough to conclude that the requirements of Polansky have been satisfied.

---

[23] Before the hearing itself took place, Day acknowledged in his briefing that the hearing would satisfy the hearing requirements to address constitutional concerns as established in Polansky and Doe. ECF No. 53, at 2.

### c. DAY'S CASE DOES NOT REPRESENT AN EXCEPTIONAL OR EXTRAORDINARY CIRCUMSTANCE THAT WOULD OTHERWISE REQUIRE DENIAL OF THE DISMISSAL MOTION

One last point requires addressing. Other than requiring a hearing before granting the United States' voluntary dismissal motion, Polansky sets out one other exception that a district court must consider before dismissing a relator's action: Whether there is an "exceptional" or "extraordinary circumstance" that justifies rejecting the United States' reasons for dismissal under Rule 41(a)(1) notwithstanding the substantial deference that those reasons receive. Polansky, 143 S. Ct. at 1734-35. The Supreme Court refused to set out a "grand theory" of what Rule 41 requires or what may represent exceptional or extraordinary circumstances. Id. at 1734. The only clear example of an exceptional circumstance, as noted in Polansky, is whether the relator would suffer a constitutional due process or equal protection violation if a court dismissed the complaint without a hearing. See id. That circumstance is not relevant here, however, because the Court held a hearing on the issues before deciding to dismiss Day's action. Supra.

Day offers an alternative basis for what he believes is an exceptional circumstance that justifies denying the United States' DISMISSAL MOTION. He claims that, not only does the United States and DOJ's presence in the suit present a conflict of interest, but that that very conflict violates his substantive due process

rights. ECF No. 53, at 2-5. That conflict itself then represents an exceptional circumstance that both warrants denying the DISMISSAL MOTION and justifies granting his REMOVAL MOTION to cure the conflict. Id. at 2. The United States argues that no conflict exists and that therefore no exceptional circumstance exists that prejudices the Relator. ECF No. 54, at 6-9. Instead, it argues that, if the Court were to recognize that a conflict exists with an underlying substantive due process violation, then remove the United States and DOJ from the case as a consequence and refuse to dismiss the action, that removal and denial would itself be a truly exceptional and unprecedented circumstance that would violate the FCA's statutory text and the constitutional prerogative of the Executive Branch to conduct litigation to which the United States is a party or is interested. Id. at 10.

The Court need not delve into the constitutional issues attendant in Day's argument because it has already held that a conflict of interest does not exist either because the United States is a party or because the DOJ is representing the United States in the action. Supra. Consequently, Day's case does not represent an exceptional or extraordinary circumstance that justifies ignoring the substantial deference given to the United States' reasons to dismiss the COMPLAINT. Based on the United States' reasons for dismissal, the substantial deference afforded to them, and the lack of any concomitant exceptional circumstance,

the Court will grant the DISMISSAL MOTION, ECF No. 9, and dismiss Day's COMPLAINT.

### 3. DAY HAS FAILED TO MEET THE HEIGHTENED PLEADING STANDARD FOR FRAUD UNDER FED. R. CIV. P. 9(b)

The United States presents an additional basis to dismiss the Relator's COMPLAINT that the Court must address. That argument rests on the traditional motion-to-dismiss framework under Federal Rules of Civil Procedure 12(b)(6) and 9(b). ECF No. 40, at 14 n.7.

For traditional, non-FCA motions to dismiss, Rule 12(b)(6) allows a party to dismiss a complaint for failure to state a claim when the complaint lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable" and demonstrates "more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556-57). The Court must accept the COMPLAINT's factual allegations as true in its review. Id.

Furthermore, allegations of false claims under the FCA are quintessential "fraud-based claims that must satisfy [Rule] 9(b)'s pleading standard." United States ex rel. Grant v. United Airlines, Inc., 912 F.3d 190, 196 (4th Cir. 2018) (citing United States ex

rel. Nathan v. Takeda Pharms. N. Am., Inc., 707 F.3d 451, 455-56 (4th Cir. 2013)). Rule 9(b) imposes a heightened pleading standard on plaintiffs who "must state with particularity the circumstances constituting fraud. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Consequently, to prevail under a Rule 9(b) challenge, a plaintiff "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Nathan, 707 F.3d at 555-56 (quoting Wilson, 525 F.3d at 379). "More precisely, the complaint must allege 'the who, what, when, where and how of the alleged fraud.'" United States ex rel. Ahumada v. NISH, 756 F.3d 268, 280 (4th Cir. 2014) (quoting Wilson, 525 F.3d at 379 (internal quotation marks omitted)).

The United States argues that Day fails to meet the Rule 9(b) standard. Specifically, it argues that Day never actually "allege[s] who . . . engaged in fraudulent conduct, what the fraudulent conduct consisted of, or when or where or how such conduct occurred, or falsity at all." ECF No. 40, at 14 n.7 (citing United States ex rel. Searle v. DRS Tech. Servs., Inc., No. 1:14-cv-00402, 2015 WL 6691973, at *8 (E.D. Va. Nov. 2, 2015)[24] (emphasis

---

[24] In its briefing, the United States cites Searle as though it is a decision from the Fourth Circuit Court of Appeals. While the Fourth Circuit did consider and decide Searle on appeal, United States ex rel. Searle v. DRS C3 & Aviation Co., 680 Fed. App'x 163

added by the United States)). The United States thus concludes
that, because of these realities, combined with the fact that the
"Relator does not identify any false statement or false claim,"
Day fails to satisfy Rule 9(b), which itself is a sufficient basis
to dismiss the COMPLAINT. Id.[25] The Court agrees that the COMPLAINT
fails to meet the requirements of Rule 9(b) and therefore dismissed
the COMPLAINT.

The United States need only demonstrate that Day has
insufficiently pled one of the multiple facets of a false claim
with particularity to prevail on the DISMISSAL MOTION. Day fails
to meet the standard on several fronts. We begin with the "what."

The COMPLAINT runs into problems before even getting off the
ground when it comes to the "what" prong. In Section 3729(a)(1),
the FCA provides seven distinct bases to allege that a defendant
has committed a false claim. 31 U.S.C. § 3729(a)(1)(A)-(G). Each
type of false claim has unique, and, at times overlapping, elements
to prove that a violation occurred, which necessarily demands the
specific pleading of facts for the unique type of alleged false
claim. Day, however, does not allege with specificity which type

---

(4th Cir. 2017) (per curiam), the citation and quotations that the
United States provides are attributable to the district court's
opinion that the Court cites to above.

[25] Day never directly addresses the United States' Rule 9(b)
arguments in any of his briefs.

of false claim the Defendants purportedly made. Instead, he generally alleges that the "Defendants, individually," engaged in violations of "31 U.S.C. § 3729(a)." ECF No. 1, at 1-2. He ends the COMPLAINT by alleging violations of all subsections of Section 3729(a)(1) except for (a)(1)(D). Id. ¶ 23. It is left to the Court, and the Defendants, however, to sift through and attempt to piece together the facts to determine what exact type of false claim the Defendants "individually" made that violate Section 3729(a)(1)(A)-(C) and (E)-(G) because Day does not attempt to describe how the facts track each type of false claim. Therein lies the difficulty for Day to survive the motion to dismiss stage: He does not even allege, with particularity, what violation of the statute that the purported false claims constitute.

For example, at several points in the COMPLAINT, Day alleges facts and conclusions that suggest a conspiracy has occurred. ECF No. 1, ¶ 15 ("The Defendants and DLA contracting officers falsely claim that these contracts for replacement parts purchases are competitive . . ."); id. ¶ 17 ("DLA contracting officers, working with the Defendants . . . are acting in violation of law and regulation . . ."); id. ¶ 22 ("This fraud and conspiracy to commit fraud amounts to billions of dollars of fraud . . ."). Section 3729(a)(1)(C) establishes that a defendant who "conspires to commit a violation" of the other subsections of Section 3729(a)(1) is liable for a false claim under a conspiracy-based theory. 31

U.S.C. § 3729(a)(1)(C). For a plaintiff to prove an FCA conspiracy, they "must show (1) the existence of an unlawful agreement between [the] defendants to get a false or fraudulent claim reimbursed by the government and (2) at least one act performed in furtherance of that agreement." United States ex rel. Decesare v. Americare in Home Nursing, 757 F. Supp. 2d 573, 584 (E.D. Va. 2010) (citing United States ex rel. Farmer v. City of Houston, 523 F.3d 333, 343 (5th Cir. 2008)). The COMPLAINT fails to allege facts that fit within the conspiracy framework to demonstrate that an FCA conspiracy has occurred. At no point does the COMPLAINT allege facts that demonstrate that the Defendants entered into an agreement with each other. Instead, he claims that the Defendants have somehow conspired with DLA officials—who, again, he never names as defendants to the suit—to submit false claims to those very governmental officials in violation of the FCA. ECF No. 1, ¶¶ 15, 17, 22. Then, without ever alleging an agreement between the named Defendants, the COMPLAINT does not present facts that sufficiently allege any act was performed "in furtherance" of the nonexistent agreement. The COMPLAINT therefore pleads with insufficient particularity facts to support the basis of a conspiracy FCA violation under Section 3729(a)(1)(C). Decesare, 757 F. Supp. 2d at 584.

Our examination of the "what" is not yet complete, however. For Day to successfully allege an FCA conspiracy, he must also

allege facts to support a separate violation of Section 3729 because an FCA conspiracy is grounded in a separate false claim in Section 3729(a)(1)(A)-(B), (D)-(G). 31 U.S.C. § 3729(a)(1)(C). The Court need not dedicate pages to each of the six potential types of false claims, five of which Day alleges occurred. It is enough to simply note that Day alleges potential violations of Section 3729(a)(1)(A)-(B) and (E)-(G), but does not describe facts that amount to false claims for almost any of these violations. Instead, it appears that only one type of false claim could even possibly be supported by the facts that Day does allege: Section 3729(a)(1)(A). Yet, the COMPLAINT fails on this front too.

Section 3729(a)(1)(A) establishes that a false claim occurs when an individual "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). To plausibly allege a claim under this Section, the relator must plead sufficiently particularized facts to demonstrate that four elements have been met: "(1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due." United States v. Walgreen Co., 78 F.4th 87, 92 (4th Cir. 2023) (quoting United States ex rel. Taylor v. Boyko, 39 F.4th 177, 188 (4th Cir. 2022) (internal quotation marks omitted)). The requisite scienter for these claims is knowledge; specifically,

the Defendants must: "(1) have 'actual knowledge of the [falsity of the] information'; (2) act 'in deliberate ignorance of the truth or falsity of the information'; or (3) act 'in reckless disregard of the truth or falsity of the information . . . '[N]o proof of specific intent to defraud' is required." Boyko, 39 F.4th at 197 (quoting 31 U.S.C. § 3729(b)(1)(A)-(B) (alterations in original)). Day has failed to allege facts with sufficient particularity to meet these elements and therefore fails to meet the pleading demands of Rule 9(b) to adequately allege that the Defendants have made false claims.[26]

---

[26] In responding to the United States' DISMISSAL MOTION, Day notes that this Court, in its prior MEMORANDUM OPINION in this case, United States ex rel. Day v. Boeing Co., No. 3:23-cv-371, 2024 U.S. Dist. LEXIS 106044 (E.D. Va. June 13, 2024); ECF No. 24, held that the Complaint contains false claims that warrant denying the DISMISSAL MOTION. ECF No. 41, at 7. In that decision, this Court stated: "Indeed, the Government completely mischaracterized the nature of the Relator's COMPLAINT by arguing that the COMPLAINT did not assert any false claims. To the contrary, the COMPLAINT quite clearly alleges false claims by the Defendants." Id. at *12-13. However, that holding does not require the Court today to deny the DISMISSAL MOTION.

The Court issued that MEMORANDUM OPINION after having only at that point considered the parties' voluntary dismissal arguments under the Polansky standard of review. In that decision, the Court noted its own prior erroneous legal conclusion that dismissal was warranted and consequently vacated its prior ORDER granting the DISMISSAL MOTION. Id. at *13-14. Today, the Court addresses those arguments as they relate to Polansky and Doe anew and holds that dismissal is warranted under the standards set forth in those cases. Supra.

Furthermore, at the time that the Court issued that MEMORANDUM OPINION, it had not yet benefited from the parties' full briefing on other arguments relevant to dismissal, including sovereign

Specifically, the COMPLAINT fails to allege sufficiently particularized facts to demonstrate that the Defendants in fact made a false claim with the requisite scienter—knowledge—to survive a Rule 9(b) motion to dismiss. The Fourth Circuit has adopted the "government knowledge" defense, which stipulates that the "government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation." United States ex rel. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002). In other words:

> [I]f the government with full knowledge of the relevant facts directed a contractor to file a claim that was later challenged as false, the fact that the contractor did what the government told it to do would go a long way towards establishing that the contractor did not knowingly file a claim known to be false.

---

immunity grounds and the Rule 9(b) standard. The United States raised these two alternate grounds for dismissal for the first time after the Court ordered additional briefing on the matter. ECF No. 40. The Court has also benefited from additional briefs from both parties on these issues. ECF Nos. 41, 42. Only now has the Court fully considered the relevant authorities on whether Day has met the pleading requirements of Rule 9(b) to survive dismissal. It is clear for the reasons set forth above that Day's COMPLAINT fails to meet that standard, notwithstanding the Court's prior statement that the COMPLAINT "quite clearly alleges false claims by the Defendants." Day, 2024 U.S. Dist. LEXIS 106044 at *13. Therefore, the Court sees no inconsistency in previously having stated that the COMPLAINT alleges false claims while simultaneously holding today that the COMPLAINT lacks sufficiently particularized facts to allege that false claims have occurred that meet Rule 9(b)'s heightened pleading standard for fraud claims.

_United States ex rel. Ubl v. IFF Data Sols._, 650 F.3d 445, 453 (4th Cir. 2011) (referencing _Becker_, 305 F.3d at 288-89). This exact circumstance has occurred in this case according to the allegations in the COMPLAINT. Indeed, Day specifically alleges that the Defendants complied with the bidding process, through DIBBS, according to the DLA's specific requirements; otherwise, they would not receive the contracts. ECF No. 1, ¶¶ 6-15. The COMPLAINT then asserts that DLA contracting officers, acting on behalf of the DLA and therefore the United States itself, engaged in this conduct "knowing" that these bids comply with the DLA's requirements for the contracts. _Id._ ¶ 17. The COMPLAINT alleges no particularized facts that demonstrate that the Defendants submitted any false bids knowing that they were false. Instead, all the alleged facts suggest that the Defendants are simply complying with the contract bidding process exactly as requested by the DLA. This is the quintessential example of "the contractor [doing] what the government told it to do." _Ubl_, 650 F.3d at 453. Therefore, the COMPLAINT does not allege sufficiently particularized facts to show that the Defendants made (1) false statements (2) with the requisite scienter (knowledge) to constitute false claims violative of the FCA.

Nor does the COMPLAINT plead sufficiently particularized facts on "who" exactly violated the FCA. _Wilson_, 525 F.3d at 379. The COMPLAINT does not differentiate between the five Defendants

when alleging that they each have made false claims to the United States as required to meet Rule 9(b)'s heightened pleading standard. Nathan, 707 F.3d at 555-56 (holding a relator "must, at a minimum, describe the time, place, and contents of the false representations as well as the identity of the person making the misrepresentation and what he obtained thereby" (quoting Wilson, 525 F.3d at 379 (emphasis added))); see also Boese & Baruch, supra, § 5.05. Instead, the COMPLAINT claims that all the Defendants have engaged in this practice over a more than twenty-year period to reap billions in ill-gotten gains. ECF No. 1, ¶¶ 20-21. There are no specifics about, for example, the false claims that Raytheon made to the DLA, nor General Dynamics, nor Lockheed Martin, nor Northrup Grumman. The closest the COMPLAINT comes to alleging facts with sufficient particularity to satisfy the "who" requirement is when it provides a hypothetical example of Boeing submitting a false claim to the DLA. Id. ¶¶ 18-19. This example, however, never occurred—or, at least, Day never alleges facts to demonstrate that Boeing engaged in such conduct. In other words, the example is but mere speculation on Day's part. See id. Without greater particularity in alleging the "who," Day merely "indiscriminately group[s] all of the individual defendants into one wrongdoing monolith," which plainly does not satisfy the stringent pleading requirements of Rule 9(b). United States ex rel. Branhan v. Mery Health Sys., No. 98-3127, 1999 U.S. App. LEXIS 18509, at *30-31

(6th Cir. Aug. 5, 1999) (Clay, J., concurring in part and dissenting in part).

Day also fails to meet Rule 9(b)'s particularity pleading requirement based on the "when" factor. Day alleges that the purported false claims "ha[ve] been ongoing since 2003 at the latest and continu[ing] until today." ECF No. 1, ¶ 24. Within this twenty-year period, from 2003 to the filing of the COMPLAINT on June 7, 2023, he does not provide a specific date on when any of the Defendants began making false claims to the DLA. Without more detail, the most that the Court can deduce from the COMPLAINT is that at least one of the Defendants submitted at least one false claim on at least one of any of the 365 days in 2003. Furthermore, throughout this twenty-year period, the COMPLAINT does not provide a single date on which any of the Defendants purportedly made a false claim to the DLA. The closest that the COMPLAINT comes to alleging particularized facts about when one of the Defendants made a false claim within this timeframe is simply a hypothetical of Boeing making a false claim to the DLA. Id. ¶¶ 18-19. No facts alleged in the COMPLAINT, however, demonstrate that Boeing ever did submit a false claim to the DLA. This Court has held that similar timeframe descriptions without additional details on when exactly a defendant has made a false claim are insufficient to satisfy Rule 9(b)'s particularity standard. United States ex rel. Hagood v. Riverside Healthcare Ass'n, Inc., No. 4:11-cv-109, 2015

U.S. Dist. LEXIS 37134, at *39 (E.D. Va. Mar. 23, 2015) ("Although Relators must allege the 'who, what, when, where, and how of the alleged fraud,' Relators' medication-pathways allegations do not allow the Court to plausibly infer the 'when' or the 'how' of the alleged false claims. Other than the general allegation that such alleged fraud occurred over 'several years,' the First Amended Complaint lacks specific allegations of when any false claims were submitted to Government Payors." (internal citations omitted) (emphasis added)). Without greater detail on when exactly each of the Defendants made false claims to the DLA within this twenty-year period, the Court does not see how the facts as alleged in this case differ from those in Riverside Healthcare. If anything, the timeframe at issue here is even less clear than the "several years" alleged in that case. Therefore, Day has failed to plead sufficiently particularized facts to satisfy Rule 9(b)'s heightened pleading standard on the "when" factor as well.

After examining the COMPLAINT in a light most favorable to the Relator and taking the alleged facts therein as true, it is evident that the COMPLAINT fails to plead sufficiently particularized facts to meet Rule 9(b)'s demanding pleading standard. Specifically, the COMPLAINT fails to provide sufficiently particularized facts on exactly "what" false claims occurred, "who" made them, and "when" those purported false claims were made to the DLA. Wilson, 525 F.3d at 379. Consequently, the

Court will grant the United States' DISMISSAL MOTION, ECF No. 9,

and dismiss Day's COMPLAINT on this ground as well.

### IV. CONCLUSION

For the foregoing reasons, the REMOVAL MOTION, ECF No. 37,

was denied and the DISMISSAL MOTION, ECF No. 9, was granted.

It is so ORDERED.

                                        /s/      _REP_

                              Robert E. Payne
                              Senior United States District
                              Judge

Richmond, Virginia
Date: April __V__, 2025